## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | No. 14-cv-3385 |
| Plaintiff, | ) ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| AUTOZONE, INC. and AUTOZONERS, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

In its governing second amended complaint [134][1] ("Complaint"), Plaintiff United States Equal Opportunity Commission ("EEOC") brings suit against Defendants AutoZone, Inc. and Autozoners, LLC (together, "Defendants") for alleged violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Currently before the Court are EEOC's motion for partial summary judgment [297] and Defendants' motion for summary judgment [303]. For the following reasons, EEOC's motion for partial summary judgment [297] is denied and Defendants' motion for summary judgment [303] is granted in part and denied in part. Defendant AutoZone, Inc. is entitled to summary judgment on the claims brought against it. Defendants are also entitled to summary judgment on claimant Gomez's (1) retaliation claim and (2) failure to accommodate claim, but only to the extent EEOC seeks relief from the rotating shift requirement as a reasonable accommodation. Defendant's motion for summary judgment is otherwise denied. This case is set for a telephonic status hearing on October 17, 2022, at 9:45 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

---

[1] Citations in brackets are to docket entries; the Court uses the page numbers printed along the top of each page.

## I.        Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits, see [265-3], [280-1], [280-2], [280-3], [292], [293], and are undisputed except where a dispute is noted.

### A.        The Parties

Plaintiff EEOC brings this lawsuit on behalf of eight claimants who were employed at AutoZone retail stores between 2009 and 2011.  Defendant Autozoners, LLC ("Autozoners") is a Nevada limited liability corporation doing business throughout the United States, including within this district.  See [134] at 2.  Defendant AutoZone, Inc. ("AutoZone") is Autozoners' holding corporation and also a Nevada corporation.  *Id.*; see also [280-3] at 2.  It is disputed which Defendant—Autozoners or AutoZone—employed the claimants.  Defendants maintain that AutoZone "is the entity that employed all claimants, all managers with responsibility over the claimants, and all decision-makers in this matter," and AutoZone "is simply a holding company." [280-3] at 1-2.  EEOC disputes this on the basis that Defendants' employees understood that they were employed by an entity called "AutoZone" and not AutoZoners; and that AutoZone issued handbooks and attendance correction action forms to Defendants' employees.  See *id.* at 2.

Claimants Gonzala Gomez ("Gomez"), Herman Matasar ("Matasar"), Adrian Viguera ("Viguera"), and Julio Lozada ("Lozada") were employed by one or both Defendants at stores in the greater Chicago area, which were part of the Chicago Region at the time of the claimants' separations from Defendants.  See [280-3] at 2-3.  Tina Cleveland ("Cleveland") was the Regional Human Resources Manager ("RHRM") over the Chicago Region and, thus, had responsibility with respect to the stores in which claimants Gomez, Matasar, Lozada, and Viguera worked.  See [280-3] at 3.  She was a decision maker for the aggrieved individuals' terminations; Defendants maintain that she was the sole decisionmaker, while EEOC disputes this.  See *id.*

Claimant Gary Clay[2] worked at an AutoZone in Waukegan, Illinois, which is part of the Milwaukee Region. [280-3] at 3. Claimant Dawn Blyden (formerly Devereau) ("Blyden") was the RHRM over the Milwaukee Region, and thus over the store in which Clay worked. *Id*. Defendants maintain that Blyden decided to discharge Clay; EEOC disputes that Blyden was the sole decisionmaker. *Id*.

Claimants Kyle Jackson ("Jackson"),[3] Sean Robbins ("Robbins"), and Jerald Lindsey ("Lindsey") were employed at AutoZone stores in the St. Louis Region. See [280-3] at 3-4. Rebecca Peetz ("Peetz") was the RHRM over the St. Louis Region and, thus, had responsibility with respect to the stores in which claimants Jackson, Lindsey, and Robbins worked. She was a decision maker for the aggrieved individuals' terminations; Defendants maintain that she was the sole decisionmaker, while EEOC disputes this. See [280-3] at 4.

**B.     The Governing Second Amended Complaint**

The EEOC alleges that all of the claimants made requests to have disability-related absences excused or covered by accrued vacation time. [280-3] at 4. However, the EEOC alleges, Defendants failed to make exceptions to their "no fault" attendance policy. *Id.* According to the EEOC, the claimants would not have been discharged but for absences that were inextricably linked to their disabilities. *Id*. at 4-5. The EEOC alleges that Defendants' conduct was intentional and done with malice or reckless indifference to the claimants' federally protected rights. See *id.* at 5.

---

[2] Mr. Clay died on October 15, 2021. See [308]. EEOC waives any claim to further accrual of damages for lost wages for the period after October 2021 and will seek Clay's backpay in accord with his availability and mitigation.

[3] Mr. Jackson died on April 3, 2021. See [307]. EEOC waives any claim to further accrual of damages for lost wages for the period after April 2021 and will Jackson's backpay in accord with his availability and mitigation.

### C.      Defendants' Store Operations

The AutoZone stores at which the claimants' work consisted of: (a) only "do it yourself" or DIY stores, which just sold to retail customers; (b) stores with both DIY and commercial departments, where the commercial departments serviced repair shops, tire stores, and other commercial accounts; or (c) hub stores, which had DIY, commercial, and hub departments. The "hub" department was like a warehouse and made deliveries to other AutoZone stores in the area.

The Store Manager was the highest-ranking manager on site who was regularly at the store. However, Store Managers have no authority to make termination decisions. See [280-3] at 5-6. Store Managers report to District Managers. District Managers, who oversee eight to twelve stores, also lack authority to make termination decisions. See *id*. at 6. District Managers report to the Regional Manager. While Regional Managers make termination decisions with respect to other issues, they do not decide to terminate individuals for attendance policy violations or job abandonment. See *id*. Decisions to terminate individuals for attendance policy violations or job abandonment are made by the RHRMs; it is disputed whether the RHRMs are the sole decisionmakers (as Defendants claim) or not (as EEOC claims). See *id.*; [293] at 3.

Parts Sales Manager ("PSM") is also a management position. PSMs are responsible for opening and closing the store and completing paperwork that requires a password, which provides greater access to information such as the manager's next-day review, processing returns, and receiving merchandise. See [280-3] at 7. A PSM would be the highest-ranking manager in the store if the Store Manager was not present and if the store either had no Assistant Store Manager or the Assistant Store Manager was also absent. *Id*.

Employees at a store are either Full-Time or Part-Time. AutoZone defines "FullTime" as being able to work any and all hours and days of the week that the stores are open. [280-3] at 7.

4

PartTime employees, in contrast, can limit their availability to work. However, EEOC disputes that this policy was consistently applied. See [280-3] at 7-8. According to Defendants, full-time managers are required to be able to work rotating shifts, meaning they will work some opening shifts, some closing shifts, and some mid-shifts depending on the day, and that they will not have a set schedule (working the same days/hours each week). *Id.* at 8. EEOC disputes this on the basis that Defendants have "indicated there are situations where full-time managers are given fixed schedules." *Id.* EEOC cites to Gomez's testimony concerning her experience working at a different store (2257), which was under a different manager; she named three employees (Efrain, Paula, and Julio), two of whom were PSMs, who worked on a 7:00 a.m. – 4:00 p.m. scheduled without weekends or holidays. According to Defendants, Store 2257 had five to 6 PSMs and an assistant manager and store manager, while Store 2593 only had 3 or 4 PSMs and a store manager. [272-1] at 50. According to Defendants, there must be at least one manager and one other employee (who could also be a manager) present in order for the store to open. See [280-3] at 8-9. While EEOC does not dispute that this is Defendants' policy, it points out that Defendants' witnesses could not remember any time a store did not open and one witness recalled managers opening the store without another employee present. See *id*.

D. **Attendance and the Points System**

Defendants' employee handbook ("Handbook") notified employees that they were expected to report to work on time and work all scheduled hours because "[w]hen an AutoZoner is absent or late for work, it creates a hardship for other AutoZoners and jeopardizes customer service in AutoZone stores." [280-3] at 9. EEOC disputes that all employees received the Handbook or received any training on attendance. See *id*. The Handbook also advised employees that "continued tardiness, unauthorized and/or unexcused absenteeism" could lead to discipline,

including termination. *Id*. Employees were terminated for attendance issues during this time period, before AutoZone's formal points system went into effect. See [270-32] at 48. Employees were further advised that if they failed to call in or report to work for two consecutive days, AutoZone will "assume[] the AutoZoner has abandoned the job, and the AutoZoner's employment is automatically terminated." [280-3] at 9.

The parties dispute how important it is for AutoZone employees to show up, and show up on time, for their scheduled shifts. EEOC claims that "[a]t AutoZone, employees within a job title are fungible and are often called upon to cover each other's shifts and may even cover at stores other than their own." [293] at 3; see also [292] at 2-3. EEOC points out that "AutoZone required management employees to cover shifts for absent employees and AutoZone permitted other employees flexibility in scheduling." *Id*. Defendants, on the other hand, emphasize the testimony of various employees, including claimants, acknowledging that: (a) they could not cover each other's shifts easily or all the time; (b) finding coverage was challenging; and (c) it was even harder to find any employees to cover shifts during the weekend. *Id*. at 4.

In 2009, AutoZone began to use a formal point system to keep track of employees' attendance and timeliness. See [265-7] at 78-81. AutoZone adopted the system in response to "rising problems with employees being late or absent on the weekends." [280-3] at 10. AutoZone sought to formalize the tracking of attendance so that employees knew precisely what would be expected of them and how they would be held accountable regarding attendance. Through the 2009 policy, AutoZone continued to advise employees that being absent or late created a hardship for other employees and jeopardized customer service and that employees could be disciplined, and even discharged, for continued tardiness and unauthorized and/or unexcused absenteeism. The

company also continued to notify employees that if they failed to call in or report to work for two consecutive days, that would be deemed job abandonment and the employees would be terminated.

The only substantive changes to the policy in 2009 were the issuance of "occurrence points" and the implementation of a progressive discipline system that corresponded with the number of points and was based on factors such as: (1) when the absence/tardy occurred (weekday or weekend); and (2) whether the employee provided proper notice and/or advance notice of the absence and/or tardiness. See [280-3] at 11. The progressive discipline policy pertaining to attendance policy violations consisted of a verbal warning, first written warning, second written warning, serious violation, and ultimately, termination. The progressive discipline policy did not cover situations involving job abandonment. An employee who accumulated 12 points could be terminated. Employees could receive four or five warnings about attendance issues before they faced a termination decision. See [292] at 11. AutoZone had a policy to post attendance reports daily to ensure employees knew how many points they had accumulated. However, EEOC disputes that "store management perfectly followed this policy." [280-3] at 12.

The attendance policy provides that no occurrence points would be given for any absences or tardiness that are (1) "covered by AutoZone's Short Term Disability leave"; (2) "approved as an FMLA leave or absence"; (3) "related to emergency volunteer responsibilities, such as EMT, firefighter, and police officer"; or (4) "covered by approved vacation, funeral leave, military obligations, jury duty, hospital confinement, work-related injuries, [or] approved leave of absence." [265-7] at 80. These four exceptions are set out in chart form in the Handbook. Above the chart, there is a line warning: "**Important**: Exceptions not outlined in this policy count as an occurrence." *Id.*

Defendants maintain, but EEOC disputes, that as used in its policy, "[t]he term 'short term disability' was intended to include any disability." [280-3] at 13. Defendants rely on a declaration from Nancy Stephens ("Stephens"), who was employed by Autozoners as Director of Human Resources from 2006 to 2010. See [265-7] at 102. Stephens states that she drafted the 2009 Attendance Policy. She claims that the policy's "use of the phrase 'short term disability' is intended to cover any known disability." *Id.* She further states that "the attendance policy was to be read in connection with the other policies and procedures including, but not limited to, the ADA policy on the very next page of the 2009 handbook," which "advises employees how to request accommodations with respect to any workplace issues or polices, including with respect to the attendance and job abandonment policies." *Id.* EEOC disputes that "short term disability" includes any disability, pointing to the plain text of the policy and the fact that "leaves of absence go through the benefits department, not the RHRM per AutoZone's policy." [280-3] at 13.

When the revisions to the attendance policy in the 2009 Handbook were made, there were no changes to AutoZone's 2008 ADA policy, which was the next policy in the Handbook after the attendance policy. [280-3] at 13. Under that policy, RHRMs were responsible for evaluating requests for disability-related accommodations. *Id.* at 9-10. The policy stated, in relevant part: "AutoZone attempts to accommodate disabled employees and job applicants to enable them to perform the essential functions of their jobs in a safe and efficient manner. AutoZone affords reasonable accommodation to qualified applicants and AutoZoners with a known disability, provided that the accommodation does not cause undue hardship to AutoZone or, irrespective of the accommodation, that such individuals do not pose a direct threat to the health and safety of themselves or others. Applicants and AutoZoners with disabilities may inform their manager/ supervisor, Human Resources or AutoZoner Relations of the disability and may suggest, on a

confidential basis, how AutoZone may reasonably accommodate them." [265-7] at 81; see also [293] at 4.[4]

Defendants take the position that under this policy, a documented disability should not result in points being awarded and that store managers should inquire why an employee is presenting a doctor's note as an explanation for an absence or tardiness and seeking to not receive points. See [292] at 1. Defendants also maintain, but EEOC disputes, that Store Managers and District Managers were informed that under the ADA policy, accommodations to the attendance policy would be made if absences/tardies were related to a disability. [280-3] at 15. Defendants further maintain that individuals who reported that their absences or tardiness were due to a disability did not receive discipline in connection with their absence or tardiness. *Id.* at 10. EEOC does not dispute what the policy says, but disputes whether points were, in fact, assigned to employees who were late or absent due to a disability. *Id.* at 14. Defendants also assert, but EEOC disputes based on the experience of Matasar, that although employees who were absent or late could receive points, employees who left a shift early, for any reason whatsoever, including due to a medical condition and/or disability, did not receive any points during 2009-2011. *Id.* at 15.

Pursuant to AutoZone's ADA policy, if an employee sought an accommodation in the form of having some absences or occurrence points excused because they were allegedly incurred due to a disability or if employees requested any accommodation to the attendance policy due to a disability, then the RHRMs were tasked with reviewing the facts and deciding whether the accommodation should be granted. [280-3] at 15. EEOC does not dispute that this was the policy,

---

[4] EEOC states that "AutoZone's own policy says that [employees] do not have to say 'ADA' or submit anything in writing or even request a specific accommodation." [292] at 5. However, the transcripts on which EEOC relies show that Blyden and Cleveland were asked in their depositions about AutoZone training materials concerning the ADA, not about the policy as it was spelled out in the 2009 Handbook. See [270-8] at 30-31 (Blyden deposition); [270-1] at 28-29 (Cleveland deposition).

but disputes that this was "how things actually operated," as "[m]anagers had a great deal of discretion in selecting the reason codes for absences and therefore in whether or not points were awarded so managers could excuse absences related to disability by selecting a reason code that did not assign points, like management change due to sales." *Id.* at 16. Defendants assert, but EEOC disputes, that the implementation of the points policy had no effect on the interactive process that RHRMs had previously engaged in with employees. *Id.*

AutoZone has a "Problem-Solving Procedure" in its Handbook, which provided employees with a chain of command to report workplace issues, including allegations of disability discrimination and failure to make a reasonable accommodation. Employees could utilize this problem-solving procedure if they wanted to (1) dispute receiving an occurrence point; (2) claim that the point was incurred in connection with a disability-related absence or tardiness; or (3) complain about any discipline they received for attendance policy violations. However, EEOC disputes that all employees knew how to exercise this procedure or that the procedure was effective, given that claimants allegedly complained about points but did not receive relief. See [280-3] at 16.

It is undisputed that a manager had discretion to "erase" a point within a set period of time, after which the computer system would not allow a point to be erased. See [280-3] at 16-17; [292] at 10. It is also undisputed that managers could manually track points after this set period of time. Thus, while the computer system might show that an employee had exceeded 12 points, that employee might not be terminated because adjustments to those points might have been made, and the points might have been tracked manually. See [280-3] at 16-17. However, EEOC disputes that it was a common occurrence that managers manually tracked points. See *id.* at 17.

10

RHRMs cannot determine, solely by reviewing the reports that they received from the attendance tracking system, why a manager has made an adjustment to an employee's points; for instance, they could not tell if a manager made adjustments due to favoritism. See [292] at 2. Before terminating an employee for attendance, RHRMs were to verify that all of the proper steps for progressive discipline had been followed; if they had not, they should receive the appropriate step in the progressive discipline rather than being terminated. See [280-3] at 17. EEOC states that "RHRM would not necessarily verify with the employee regarding the absences and the reasons for their absences—RHRM would instead rely on managers to alert them to any accommodation related issues." *Id.*; see also [293] at 3. Thus, before an RHRM made a decision to terminate someone for attendance, she was supposed to: (a) review the employee's disciplinary file and any medical notes; (b) contact the District Manager and/or Store Manager to ascertain whether they knew of any reasons that employees should not have received points; and (c) ascertain whether there were any other circumstances that would weigh against terminating a particular employee, such as whether other employees in the store had accrued 12 or more points and had not been terminated. EEOC disputes that the RHRM always reviewed any medical notes before deciding to terminate an employee. See [280-3] at 18.

Defendants' policy is that the problem-solving procedure can be used by employees to appeal their termination and be reinstated; however, EEOC disputes the effectiveness of this policy. See [280-3] at 18. When an employee believes she was wrongfully terminated, her RHRM is supposed to conduct a review of the points and reinstate the employee if points were given when they should not have been. See *id.* at 18-19. EEOC disputes that this is always done. AutoZone has reinstated employees after they were terminated; however, Viguera and Lozada were not reinstated after providing medical documentation about absences due to their disability. See [280-

11

3] at 19; see also [270-1] at 14 (Cleveland's testimony that, "without being able to specifically recall an individual when this happened, if someone was terminated for job abandonment and they came back and provided documentation to explain why, more specifically, you know, a medical reason or something then we take a look at it and if it's sufficient then we reinstate them."). In 2010, one AutoZone employee, Owen McKevitt ("McKevitt"), was returned back to work after being terminated for job abandonment; he was reinstated and placed on a leave of absence after bringing in a doctor's note to explain that he did not abandon his job. See [292] at 7.

While Defendants point to testimony that no RHRM allowed an employee to receive an unlimited number of occurrence points for any reason, including when an employee asked for this due to a need to drop children off at school, EEOC points out that some employees received a considerable number of points without being terminated: Dr. Cromwell's report found that between 2009 and 2011, 1,231 employees reached 12 points, and that of those employees 226 worked for 29 or more days following their twelfth point and that 67 employees were never terminated after reaching 12 points. See [280-3] at 19. (The Court considers Defendants' *Daubert* challenge to Dr. Cromwell's report in its analysis below.)

According to EEOC, from 2009 through 2011 no employee in any store where a claimant worked requested a reasonable accommodation. [292] at 11. Defendants maintain that this overstates the record, and explains that during a meet and confer, "the parties agreed that AutoZone would 'produce disability accommodation requests from 2009 to 2011 regarding disability-related leave and/or requests to exclude, reduce or modify points for stores' that the EEOC's claimants worked at" and "AutoZone confirmed that there were no such requests from an employee at those stores during the relevant time period." *Id.* at 11-12. AutoZone was also unaware of any employees in the applicable districts who sought intermittent FMLA leave between 2009 and 2011.

12

*Id.* at 12. Specific facts concerning the individual claimants' disabilities, attendance records, and terminations are discussed in the analysis section below.

## II.    Legal Standards

### A.    Summary Judgment

This matter is before the Court on cross-motions for summary judgment. "When courts consider cross-motions for summary judgment, the 'ordinary standards' remain in effect." *Ironshore Specialty Ins. Co. v. Akorn, Inc.*, 543 F. Supp. 3d 605, 610 (N.D. Ill. 2021) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch/Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). This standard "remain[s] unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow*, 855 F.3d at 797; see also *Birch/Rea Partners*, 27 F.4th at 1249; *Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*, 340 F. Supp. 3d 706, 709 (N.D. Ill. 2018). The Court "'may not make credibility determinations, weigh the evidence, or decide which

inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252. "'If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Doxtator v. O'Brien*, 30 F.4th 852, 860 (7th Cir. 2022) (quoting *Liberty Lobby*, 477 U.S. at 249–50).

## B.     ADA

The ADA prohibits employers from discriminating against employees on the basis of their disability. 42 U.S.C. § 12112(a); see also *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 850 (7th Cir. 2019). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an … employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "To invoke protection under the ADA, a plaintiff must first prove that he is disabled within the meaning of the ADA." *Bob–Maunuel v. Chipotle Mexican Grill, Inc*., 10 F. Supp. 3d 854, 880 (N.D. Ill. 2014) (citing *Cassimy v. Bd. of Educ. of Rockford Pub. Sch. Dist. No. 205,* 461 F.3d 932, 935–36 (7th Cir. 2006)).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities ...; (B) a record of such an impairment; or (C) being regarded as having such an impairment...." 42 U.S.C. § 12102(1). "Major life activities" is defined to include, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A); see also *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) (working constitutes major life activity). Under the 2008 amendments to the statute, "a person with an impairment that substantially limits a major life activity, or a record of one, is disabled, even if the impairment is 'transitory and minor' (defined as lasting six months or less)." *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (quoting 42 U.S.C. § 12102(3)(B)). "Likewise, '[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.'" *Id.* at 1172-73 (quoting 42 U.S.C. § 12102(4)(D)). "The question of whether an individual meets the definition of disability under [the ADA] should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4). Following the 2008 amendments, "the term 'substantially limits' is to be construed broadly in favor of expansive coverage." *Bob–Maunuel*, 10 F. Supp. 3d at 880.

The elements of a claim for failure to accommodate an employee's disability are: (1) the employee was a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). "If the plaintiff establishes these elements of the prima facie case, the burden shifts to the employer to prove that the requested accommodation would impose an undue hardship" on the operation of the defendant's business. *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021).

### 1.     Qualified Individual With a Disability

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This is typically a two-step inquiry. "The first step asks whether the plaintiff has the basic qualifications required for the position, such as educational prerequisites, employment experience, skills, or licenses." *Davidson v. State Collection Serv., Inc.*, 824 Fed. Appx. 424, 427 (7th Cir. 2020). "The second step asks whether the plaintiff can perform the essential functions of the job with or without reasonable accommodations." *Id.*

"[W]hether certain functions are essential functions of a job under the ADA is an almost quintessential question of fact." *EEOC v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 656 (7th Cir. 2022). In making this determination, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). But while "employers play a big role in defining what is essential," their view is not controlling. *Gentile v. Cnty. of DuPage*, 2022 WL

16

345078, at *6 (N.D. Ill. Feb. 4, 2022). The Court may also consider, among other things, "the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241–42 (7th Cir. 2018). And "[a] factfinder can reasonably infer that a job function is not essential if an employee who cannot perform the function nevertheless succeeded at the job for a long period." *Kotaska v. Federal Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020).

## 2. Employer's Awareness of Disability

"Generally, an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation." *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018) (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)); see also *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134-35 (7th Cir. 1996). This initial duty "requires at most that the employee indicate to the employer that she has a disability and desires an accommodation." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). "The employee need not use the word 'accommodation' or any other magic words when making a request," *Matland v. Loyola Univ. of Chicago*, 2013 WL 5818884, at *4 (N.D. Ill. Oct. 28, 2013) (citing *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir. 1996)), but should "make [the] employer aware of the work limitations surrounding a disability." *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Sup. 2d 913, 922 (N.D. Ill. 2013); see also *Hoff v. Performance Food Group, Inc.*, 2009 WL 4672732, at *5 (C.D. Ill. Dec. 1, 2009) (in an ADA failure to accommodate case, "the employer must know of the claimed limitation in order to make a

17

reasonable accommodation").[5]  "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Sears, Roebuck*, 417 F.3d at 804.  "In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's request for assistance, or by intentionally remaining in the dark."  *Id.* (citing *Bultemeyer,* 100 F.3d at 1285).  "[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.'"  *Malas v. Hinsdale Township Dist. #86*, 2019 WL 2743590, at *20–21 (N.D. Ill. July 1, 2019) (quoting *Bultemeyer*, 100 F.3d at 1285-86).

### 3.    Failure to Reasonably Accommodate Disability

Once the employee provides notice that she has a disability and requests an accommodation, the employer is required to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances.  *Nehan v. Tootsie Roll Industries, Inc.*, 54 F. Supp. 3d 957, 975 (N.D. Ill. 2014).  The plaintiff bears the burden of showing that the accommodation he requests "is reasonable on its face."  *Ford*, 942 F.3d at 850.  Then the burden "shifts [to] the employer to prove that the accommodation would impose on the employer an undue hardship as defined by the ADA."  *Id.*  "The reasonableness of a requested

---

[5] In the section of their brief addressing the "employer's knowledge" element of the prima facie case, Defendants assert that "[t]o establish that a claimant suffered an adverse action, such as a failure to make a reasonable accommodation for a disability, the EEOC must demonstrate that 'her employer was not in fact relying on her conduct when it took adverse action against her but instead was animated solely by her disability.'"  [265-1] at 21 (citing *Spring-Weber v. City of Chicago*, 2018 WL 4616357, at *7 (N.D. Ill. Dept. 26, 2018)).  But *Spring-Weber*, as well as the other cases cited by Defendants, involved an ADA discrimination claim, not a failure to accommodate.  EEOC is not arguing that the claimants were fired *because they are disabled*; rather, EEOC maintains that Defendants failed to accommodate the claimants' known disabilities and, as a result, they were denied reasonable accommodations that would have allowed them to continue doing their jobs.

accommodation is a question of fact." *Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (citing *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir. 1996)). "The Seventh Circuit has only deemed an accommodation per se unreasonable when the accommodation itself creates 'an inability to do the job's essential tasks.'" *Wal-Mart*, 38 F.4th at 658 (quoting *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017)). "Where an accommodation does not render an employee unable to do a job's essential functions, … then the default fact-based case-by-case approach to ADA claims is appropriate." *Id*.

"An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer," and "both parties bear responsibility for determining what accommodation is necessary." *Bultemeyer*, 100 F.3d at 1285 (citing *Beck*, 75 F.3d at 1135); see also *Ekstrand v. School Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009). While failure to engage in the interactive process is not an independent basis for liability under the ADA, it is "'actionable if it prevents identification of an appropriate accommodation for a qualified individual.'" *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 972 (7th Cir. 2020) (quoting *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014)); see also *Igasaki v. Illinois Dept. of Fin. & Prof'l Reg.*, 988 F.3d 948, 961 (7th Cir. 2021). When "a reasonable accommodation was possible and the employer did not offer it," then responsibility for the failure to accommodate "will lie with the party that caused the breakdown" in the interactive process. *Williams v. Board of Ed. of City of Chicago*, 982 F.3d 495, 505 (7th Cir. 2020) (citing *Sansone v. Brennan*, 917 F.3d 975, 980 (7th Cir. 2019)). The Court examines the "process as a whole to determine whether the evidence requires a finding that one party's bad faith caused the breakdown." *Sears, Roebuck*, 417 F.3d at 806. An employer may "request[] a doctor's note as part of the interactive process," but may "not simply ignore Plaintiff's request for an

accommodation until Plaintiff figured out that Defendant required medical documentation." *Malas*, 2019 WL 2743590, at *21 (citing *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018)).

## III.  Analysis

Defendants move for summary judgment in full and maintain that EEOC cannot meet its *prima facie* burden to show that AutoZone failed to provide a reasonable accommodation to any of the eight claimants.  EEOC cross-moves for summary judgment on elements 1 and 3.  It argues that "[a]ny reasonable jury would be compelled to conclude, based on the undisputed facts, that each aggrieved individual ("claimant") was a qualified individual with a disability (prong one) and that AutoZone failed to accommodate each claimant's disability by showing flexibility in the application of its attendance policy though AutoZone had the capacity to do so (prong three)." [280] at 12.[6]  EEOC also argues that, to the extent that it is not entitled to summary judgment itself on elements 1 and 3, the Court should deny summary judgment to Defendants and leave the determination of the case to a jury.  Since the issues raised by the parties' motions overlap substantially, the Court will consider both motions together in the following analysis.  It first addresses issues that are common to all of the claimants, and then discusses the individual claimants.

---

[6] "EEOC acknowledges there is a dispute of facts regarding AutoZone's knowledge of the claimant's disabilities and of the relationship between their disabilities and their tardiness or absences from work and therefore EEOC does not seek summary judgment on prong two."  *Id*. at 12, n.1.

### A.    Issues Common to All Claimants

#### 1.    Whether AutoZone, Inc. Is A Proper Defendant

Defendants argue that Autozoners is the only proper defendant to this action and, therefore, AutoZone is entitled to summary judgment in its favor, because AutoZone is simply a holding company and did not employ any of the claimants.  See [265-1] at 8.

EEOC responds that AutoZone is also a proper defendant because the claimants' employment application uses the term "AutoZone" and makes no reference to "Autozoners LLC," which gave claimants the impression "that an entity called AutoZone (not called Autozoners) was their employer."  [280] at 57-58 (citing two Illinois cases concerning piercing the corporate veil, *Papa v. Katy Indus., Inc*., 166 F.3d 37, 941 (7th Cir. 1999), and *Jackowski v. Seoco, Inc. Northern*, 2001 WL 709485, at *2 (N.D. Ill. June 22, 2001)).  In addition, EEOC argues, "AutoZone, Inc. issued the attendance policy that is at the heart of this case and that resulted in the termination of the claimants."  *Id.* at 58.

EEOC's citations indicate that it intends to rely on a veil-piercing theory to hold AutoZone liable to the claimants. See [280] at 57-58.  As the party asserting veil-piercing, EEOC bears the burden of proof.  See *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008).  "Veil-piercing is an equitable remedy governed by state law." *Laborers' Pension Fund v. Lay-Com, Inc*., 580 F.3d 602, 610 (7th Cir. 2009).  Since both Defendants are incorporated in Nevada, see [134] at 2-3, the Court applies Nevada law. *Laborers' Pension Fund*, 580 F.3d at 610.  In Nevada, "[t]he requirements for finding alter ego and piercing the corporate veil are: '(1) The corporation must be influenced and governed by the person asserted to be its alter ego[;] (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under

the circumstances, sanction a fraud or promote injustice.'" *Lorenz v. Beltio, Ltd*., 963 P.2d 488,

496 (Nev. 1998) (quoting *Ecklund v. Nevada Wholesale Lumber Co*., 562 P.2d 479, 479–80 (Nev.

1977)); see also *Clarke v. Service Employees Int'l Union*, 495 P.3d 462, 468 (Nev. 2021).

EEOC does not develop a veil piercing argument sufficiently to avoid summary judgment.

See *Krebs v. Graveley*, 861 Fed. Appx. 671, 673 (7th Cir. 2021) ("The Court takes well the

instruction from the Court of Appeals that it should not conduct a party's research or invent

arguments on a party's behalf."); *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("We

have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are

unsupported by pertinent authority, are waived (even where those arguments raise constitutional

issues."). Most obviously, EEOC presents no argument or evidence that it would "sanction a fraud

or promote injustice" to treat AutoZone and Autozoners as separate corporate entities in this

lawsuit. *Lorenz*, 963 P.2d at 496. There is no suggestion that Autozoners is "undercapitalized" or

is hiding behind AutoZone "to escape its debts," such that the claimants might be unable to collect

from Autozoners on any eventual judgment. *Ecklund*, 562 P.2d at 480. In short, EEOC fails to

identify sufficient evidence in the record from which a reasonable jury could conclude that "the

financial setup" of Autozoners is "a sham and caused an injustice." *North Arlington Medical

Bldg., Inc. v. Sanchez Const. Co*., 471 P.2d 240, 244 (Nev. 1970). Therefore, the Court concludes

that AutoZone, Inc. is entitled to summary judgment in its favor on all claims brought against it.

### 2.  Whether Attendance Is An Essential Function of the Claimants' Jobs and Whether Flexible Leave Is A Reasonable Accommodation

EEOC argues that it is entitled to summary judgment on elements one and three because

"[a]ny reasonable jury would be compelled to conclude, based on the undisputed facts, that each

[claimant] was a qualified individual with a disability (prong one) and that AutoZone failed to

accommodate each claimant's disability by showing flexibility in the application of its attendance

policy though AutoZone had the capacity to do so (prong three)." [280] at 12. Defendants counter that *they* are entitled to summary judgment because there is no dispute that attendance is an essential function of the job for all claimants, especially since the work they performed had to be done on AutoZone premises and the claimants had to interact with other employees and customers. See [265-1] at 11.

Both motions require the Court to resolve (1) whether attendance that complies with the 12-point policy is an essential requirement of claimants' jobs and (2) whether flexible leave is a reasonable accommodation. These two issues are intertwined: To be qualified, someone must be able to do the essential requirements of the job with or without a reasonable accommodation. An accommodation is not reasonable if it "creates 'an inability to do the job's essential tasks.'" *Wal-Mart*, 38 F.4th at 658.

"An employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 948-49 (7th Cir. 2001)). "The fact is that in most cases, attendance at the job site is a basic requirement of most jobs." *Waggoner v. Olin Corp.*, 169 F.3d 481, 484–85 (7th Cir. 1999). That said, the Seventh Circuit has not "establish[ed] a hard-and-fast rule that no absences from work need be tolerated" but instead has "indicated [a] willingness to look to the reasonableness of an accommodation of a requested medical leave." *Id.* at 485; see also *Jovanovic*, 201 F.3d at 900 ("We need not go so far as to say that regular attendance is an essential function of every job in rendering our decision today, nor do we hold that an individual with erratic attendance can never be a qualified individual with a disability under the ADA."). "[I]n evaluating any requested

23

accommodation, the issue will be whether the hardship imposed on the employer by it is 'undue.'" *Waggoner*, 169 F.3d at 485.

In this circuit, "'a brief period of leave to deal with a medical condition could be a reasonable accommodation in some circumstances.'" *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 971 n.2 (7th Cir. 2020) (quoting *Severson*, 872 F.3d at 481). "Intermittent time off or a short leave of absence—say, a couple of days or even a couple of weeks—may, in appropriate circumstances, be analogous to a part-time or modified work schedule, two of the examples listed in § 12111(9)" as potential reasonable accommodations. *Severson*, 872 F.3d at 481 (quoting 42 U.S.C. § 12111(9)). "Such an accommodation is particularly apt for 'intermittent conditions.'" *McAllister*, 983 F.3d at 971 n.2 (quoting *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)). For instance, "[s]omeone with arthritis or lupus may be able to do a given job even if, for brief periods, the inflammation is so painful that the person must stay home." *Byrne*, 328 F.3d at 381.

However, "requests for long-term medical leave have been deemed per se unreasonable in this circuit." *Severson*, 872 F.3d at 481; see also *Smith v. Cook County*, 2019 WL 151007, at *6 (N.D. Ill. Apr. 8, 2019) ("obtaining an 'open-ended' amount of leave beyond that required by the FMLA is not a 'reasonable accommodation' under the ADA" (citing *Severson*, 872 F.3d at 482)). Requiring "prolonged leave effectively excuses [a plaintiff's] inability to work, which the ADA does not require of employers." *McAllister*, 983 F.3d at 972; see also *United States ex rel. Sibley v. University of Chicago Medical Center*, 486 F. Supp. 3d 1210, 1223 (N.D. Ill. 2020) ("An employee who needs long-term medical leave *cannot* work and thus is not a 'qualified individual' under the ADA."); cf. *Majors*, 714 F.3d at 534 ("To have another employee perform a position's

24

essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.").

While the Seventh Circuit has not provided an exact cut-off point, in *McAllister*, 983 F.3d at 972, the Court held that four months leave "is plainly not a reasonable accommodation." By contrast, in *Haschmann*, 151 F.3d at 601, the court of appeals found that a reasonable jury could conclude that a two- to four-week leave—which was preceded by two and a half weeks of absences—was a reasonable accommodation for plaintiff's lupus. "The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision." *Amadio v. Ford Motor Co.,* 238 F.3d 919, 928 (7th Cir. 2001); see also *Schwab v. Northern Illinois Medical Center*, 42 F. Supp. 3d 870, 884 (N.D. Ill. 2014).

Based on the record before it, the Court cannot determine as a matter of law precisely what level of attendance is necessary for claimants to satisfy the essential functions of their jobs with AutoZone. There are material disputes concerning both the facts and the proper inferences to draw from them. Defendants emphasize that every claimant acknowledged that attendance is an essential function of their job as they admitted that: "(1) the work they performed had to be done at the store; (2) customer service was an important part of their job, and AutoZone's ability to provide good customer service depended on employees being present for their scheduled shifts and showing up for their shifts on time; and (3) when employees were absent or late, that negatively affected customer service and other employees." [265-1] at 15-16. Therefore, they conclude, "there is no dispute that attendance is an essential function of the job and that a failure to maintain consistent attendance will render a claimant 'unqualified.'" *Id*. at 16.

There can be no real "dispute that a business needs its employees to be in regular attendance to function smoothly" and that "the absence of employees is disruptive to any] work environment." *Haschmann*, 151 F.3d at 602. AutoZone needs its employees to come to work to assist customers. "However, it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job." *Id*. "Consideration of the degree of excessiveness is a factual issue well suited to a jury determination." *Id*.

While attendance is essential, there are any number of reasons why employees may be unable to make it to work. AutoZone's attendance policy recognizes this by giving employees a number of chances before they face termination for being absent or tardy. But is twelve points a reasonable cut-off for when an employee is unable to perform the duties of his job? That is debatable, and the parties both have reasonable arguments on their sides. EEOC has made a sufficient showing to avoid summary judgment on this issue, but not good enough to be entitled to summary judgment itself.

EEOC maintains that Defendants had no particular reason for choosing 12 as the maximum number of points an employee can accumulate before being terminated. But the record shows that this number was chosen because it would typically give an employee four or five warnings about attendance issues before they would be terminated. See [292] at 11. Jurors might think this was a reasonable number of chances for an employee, or they might conclude based on other factors emphasized by EEOC that strict compliance with the attendance policy was not an essential function of the claimants' jobs.

For instance, EEOC points out that since Defendants revised their attendance policy in 2011, the company's policy has been not to assess attendance points for absences due to illness, if

notice is provided or if lack of notice is due to a serious health condition. [280] at 23. As EEOC argues, one inference that might reasonably be drawn from this practice is that it "illustrates the feasibility of accommodating the claimants' absences without an undue hardship." *Id*. EEOC also points to evidence that AutoZone managers routinely covered shifts for employees who were absent and also were able to call employees from the same or different AutoZone stores and ask them to cover. Although EEOC glosses over extensive testimony that it was difficult to find employees to cover for other employees' absences, especially on weekends, see [293] at 4, and that this was the motivation behind enacting the points policy in the first place, see [280-3] at 10, Defendants' evidence is not so overwhelming that it would foreclose a reasonable jury from reaching an opposite conclusion.

EEOC emphasizes Defendants' apparent willingness to overlook excess points accumulated by employees without disabilities and argue that this undercuts their position that complying with the 12-point policy is an essential function of the job. According to EEOC, some employees received a considerable number of points in excess of 12 without being terminated. A report prepared by EEOC's economist, Dr. Erich Cromwell "found that between 2009 and 2011, 1,231 employees reached 12 points, and that 226 of them worked for 29 or more days following their 12th point and that 67 employees were never terminated after reaching 12 points." [280] at 24-25.

Defendants challenge the admissibility of Cromwell's report based on Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 and *Daubert* provide the legal framework for the admissibility of expert testimony. See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893-94 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 requires that the district

judge act as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. Partnership v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (internal quotation marks omitted)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589. Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; see also *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011).

Rule 702 and *Daubert* require the district court to engage in a three-step analysis before admitting expert testimony. The court must determine (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007)). The proponent of the expert bears the burden of demonstrating, by a preponderance of the evidence, that "the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702 advisory committee's note (2000 Amends.)). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *General Electric Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (holding that

abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

Defendants challenge the relevance and reliability of Cromwell's report. The requirement that evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (internal quotation marks and citation omitted); see also *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 804 (N.D. Ill. 2013). As to reliability, the Court must ensure that a proposed expert's methodology is "scientifically valid," *Daubert*, 509 U.S. at 592–93, and that his conclusions are "based on sufficient facts or data," Fed. R. Evid. 702(b). "The non-exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 593–94). But this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141 (internal quotation marks omitted).

"Rule 702's requirement that expert opinions be supported by 'sufficient facts or data' means 'that the expert considered sufficient data to employ the methodology.'" *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) (quoting *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013)). Whether an expert "selected the best data set to use, however, is a question for the jury, not the judge." *Manpower*, 732 F.3d at 809. Assuming there is "a rational connection between the data and the opinion," the "expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to

29

admissibility." *Id.* (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000)).

Defendants challenge the relevance of Dr. Cromwell's testimony on several bases. First, Defendants point out that it does not apply to any claimant who was fired for job abandonment. [290] at 18. That is so, but an expert's testimony need be admissible only for *some* purpose. Relevance requires that the evidence assist the jury in understanding the evidence or determining a fact in issue. *Anderson v. City of Chicago*, 454 F. Supp. 3d 808, 815 (N.D. Ill. 2020).

Second, Defendants argue that Dr. Cromwell's data actually shows that AutoZone *does* enforce its 12-point policy and therefore attendance *is* essential, since 76% of the time employees were terminated within 4 weeks after reaching 12 points, with most of those employees being terminated within two weeks of accumulating the twelfth point. See [290] at 20. But this is just one of the competing inferences that could be drawn from the data. That is not a proper issue to resolve on a *Daubert* motion or a motion for summary judgment.

Third, Defendants challenge the relevance of Dr. Cromwell's report because he does not consider whether there was any disparity between the employees who were terminated promptly on reaching 12 points and employees who were not—*e.g.*, there is no evidence that disabled employees were subject to stricter enforcement of the policy that non-disabled employees. But as EEOC points out, it is not using Dr. Cromwell's report to "support disparate impact, nondiscriminatory explanations of a disparity, a disparity based on a discriminatory factor, or an analysis of discrimination based on comparing claimants with those who are similarly situated." [298] at 20 (citations omitted). Rather, Dr. Cromwell "summarizes attendance records, which addresses whether strict adherence to the 12-point threshold is an essential function by evaluating actual employer practice." *Id.* Where some (or many) employees have been accommodated in the same manner that a disabled employee asks to be accommodated, this is relevant to whether the

requested accommodation is reasonable. See, e.g., *Miller v. Illinois Dept. of Transp.*, 643 F.3d 190, 197-98 (7th Cir. 2011) (genuine issue of material fact existed as to whether employee who had fear of heights could perform essential functions of his job as highway maintainer on bridge crew with reasonable accommodations, precluding summary judgment on claim of discrimination and retaliation in violation of ADA, where it was normal course for individual members of bridge crew to substitute and reassign tasks among themselves according to individual abilities, preferences, and limitations).

Finally, Defendants challenge the reliability of Dr. Cromwell's testimony because his analysis does not consider whether employees who were not terminated promptly after receiving a twelfth point had received all the steps of corrective action, since that process must be followed before an employee is terminated. Peetz explained that "she has occasionally discovered that not all Store Managers issued or promptly issued the appropriate corrective action regarding attendance violations." [290] at 23. This criticism goes to the weight rather than the admissibility of Cromwell's report. Defendants have not made a strong case that delays in the corrective action process occurred in any significant proportion of cases, even though this would be the type of data that would be expected to be in Defendants' possession (or certainly, not in EEOC's possession, unless provided by Defendants). To the extent that Defendants believe Cromwell "makes unfounded or incorrect assumptions," they "remain[] free to address those deficiencies through vigorous cross-examination." *Africano v. Atrium Medical Corp.*, -- F. Supp. 3d --, 2021 WL 4264237, at *4 (N.D. Ill. Sept. 20, 2021).

Given the disputed state of the record, the Court is unable to conclude as a blanket rule that being absent the number of times necessary to accumulate 12 points would render someone unable to perform the essential functions of his job. Nor can it decide whether excusing points the

31

claimants incurred due to their disabilities would have been a reasonable accommodation. The Court has reviewed the relevant case law cited by the party and, in general, the cases in which employers were found to be entitled to summary judgment involved more egregious attendance problems than the ones outlined in AutoZone attendance policy. See, e.g., *Preddie v. Bartholomew Consol. Sch. Corp*., 799 F.3d 806, 814 (7th Cir. 2015) (affirming grant of summary judgment for school that did not renew teacher's contract after he was absent 23 times during prior school year, because his absences prevented him from performing the essential functions of his teaching position); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 98 (7th Cir. 2001) (assembly line worker was not "qualified individual with a disability" where summary judgment record showed he took 23 medical leaves during his last three years of employment, totaling over 18 months of absence); *Jovanovic*, 201 F.3d at 900 (tool-and-die maker was not a "qualified individual with a disability" where he missed 24 days in the prior 12 months and his supervisor submitted an affidavit regarding the need to rely on regular attendance of a relatively small group of tool-and-die makers who were responsible for servicing 850 other workers); *Moore-Fotso v. Bd. of Ed. of the City of Chicago*, 211 F. Supp. 3d 1012, 1026 (N.D. Ill. 2016) (teacher was not "qualified individual with a disability" where school board required that its employees "demonstrate 98% attendance and punctuality," teacher was absent or tardy 78 times her first year and 52 times her second year, despite her numerous accommodations teacher never requested excused absences as ADA accommodation, and there was no indication that teacher would reliably attend work in future); *Basta v. American Hotel Register Co*., 872 F. Supp. 2d 694, 709 (N.D. Ill. 2012) (employee who took medical leaving that "ended up lasting fourteen months" could not perform the essential functions of his job).

It is a separate question however, whether an individual claimant's attendance was sufficiently poor to conclude as a matter of law that she could not do the essential functions of her job with or without a reasonable accommodation. And it is a separate question whether limited flexible leave would be a reasonable accommodation for an individual claimant, considering the particular circumstances of her absences and the limitations caused by her disability. Therefore, the Court considers each claimant separately below. See *Wal-Mart*, 38 F.4th at 658 ("Where an accommodation does not render an employee unable to do a job's essential functions, … then the default fact-based case-by-case approach to ADA claims is appropriate.").

### 3. Whether Notice to a Manager Could Be Sufficient to Notify AutoZone of a Claimant's Disability and Need for An Accommodation

For many of the claimants, Defendants argue that the decisionmaker who made the termination decision based on excess points did not know about the claimant's disability or need for an accommodation. Although the Court will address this issue for each individual claimant, it notes at the onset that Defendants have not established that the RHRM is the relevant decisionmaker just because she made the ultimate termination decision.

As detailed below in the Court's analysis of the individual claimants, most of the claimants testified that they told their managers that they had a medical condition that would require them to take time off of work. Under AutoZone's ADA policy, employees with disabilities were told they "may inform their manager/ supervisor, Human Resources or AutoZoner Relations of the disability and may suggest, on a confidential basis, how AutoZone may reasonably accommodate them." [265-7] at 81. AutoZone's own training materials say that employees do not have to say "ADA" or submit anything in writing or even request a specific accommodation. [270-8] at 31. In addition, while managers do not make termination decisions, there is evidence that "[m]anagers had a great deal of discretion in selecting the reason codes for absences and therefore in whether

or not points were awarded so managers could excuse absences related to disability by selecting a reason code that did not assign points, like management change due to sales." [280-3] at 16. Managers could also influence the RHRM's termination decisions more directly. Before an RHRM made a decision to terminate someone for attendance, she was supposed to, among other things, contact the District Manager and/or Store Manager to ascertain whether they knew of any reasons that employees should not have received points. See *id.* at 18. In addition, EEOC points out that RHRM Blyden testified that the "RHRM would not necessarily verify with the employee regarding the absences and the reasons for their absences—the RHRM would instead rely on managers to alert them to any accommodation related issues." *Id.* at 17; see also [293] at 3.

Based on this record, a reasonable factfinder could infer that an employee triggers AutoZone's obligation to reasonably accommodate his disability by notifying his manager or supervisor of his disability and need for accomodation. See *Sears, Roebuck*, 417 F.3d at 804 (where employee notified "a supervisory co-worker," a department supervisor, and a store manager, "three levels of [] management" were aware of the employee's disability). A reasonable factfinder could also conclude that if the manager or supervisor fails to engage in the interactive process, and as a result the parties fail to agree to a possible, reasonable accommodation that would have allowed the employee to keep her job, AutoZone could be liable for failure to accommodate. See *McAllister*, 983 F.3d at 972; *Igasaki*, 988 F.3d at 961; *Malas*, 2019 WL 2743590, at *21; see also *Miller*, 107 F.3d at 486-87 ("Even if an employee who as here becomes disabled while employed just says to the employer, 'I want to keep working for you-do you have any suggestions?' the employer has a duty under the [ADA] to ascertain whether he has some job that the employee might be able to fill."); *Sams v. City of Chicago*, 2018 WL 4679581, at *12 (N.D. Ill. Sept. 28, 2018) ("When an employer learns that one of its employees is unable to perform

34

essential functions of her job but wishes to remain employed, 'the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances.'" (quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996))). Although the particular facts surrounding each claimant may change the result, Defendants are not entitled to a blanket ruling that the RHRM is the only relevant decisionmaker for purposes of the claimants' failure to accommodate claims.

### B.     The Individual Claimants

#### 1.     Clay

##### a.     Background

Clay was hired by AutoZone in July 2008 at Store 2665 as a Part-Time Commercial Driver. Throughout his employment with AutoZone, Clay also worked for a newspaper from midnight until 4:00 a.m. delivering papers. Clay testified that in August 2008, he was promoted to a Full-Time Driver and then a Full-Time Commercial Specialist, a management position, by the District Manager, Joel Smith ("Smith"). Clay reported to Ruben Vega ("Vega"), the Commercial Manager, until the last three months of his employment, when Vega left. After that, Clay was the acting Commercial Manager.

Clay admitted that he knew if he had any problems with the way the Commercial Manager or Store Manager treated him, he could complain to the District Manager or the District Manager's boss, the Regional Manager. Clay knew that the Regional Manager was Jeff Teal. Clay testified the commercial department had its own phone line and that if he was absent from work, the only other Commercial Manager would be Vega. Clay admitted that during the time Vega was employed, if Vega was not at work, approximately twice a week, he was in charge of the whole commercial department. Clay testified that if he and Vega were both out of the store at the same

time, the Store Manager or other manager would have to try to cover the commercial department and the Do It Yourself ("DIY") department in the store.

Clay testified that servicing commercial accounts was a big part of his job and very important to AutoZone's business. Clay's duties as a Commercial Specialist included supervising drivers, answering phones, looking up parts, quoting prices, pulling parts, and delivering parts or finding drivers to deliver parts. Clay testified that his duties also included enforcing company policies, which he had to know and did understand. Clay admitted that he knew that AutoZone had a company Handbook because he received it and that he also knew it was online for him to review at any time. He further admitted that he understood the policies and knew he could ask management if he had any questions. Clay admitted that: (a) he knew AutoZone had an attendance policy; (b) it was important to work his assigned schedule; and (c) if he was late or absent, that could cause a hardship for the store and could jeopardize customer service. Clay admitted that he understood AutoZone required employees to report to work on time and work all scheduled hours, and that they needed to notify management at least an hour before the shift started if they would be absent, late, or had to leave early. Clay further admitted he understood the reasons behind these rules because he knew "[y]ou've got to be there to take care of the customers." [280-3] at 80.

Clay testified that he thought that if a manager did not want to give an employee a point, the manager could code the reason as "management change due to sales." [280-3] at 81; see also [293] at 2. According to Defendants, however, managers were not supposed to use the code for that purpose and could receive discipline for misusing that code, since they were not holding employees accountable for attendance issues. *Id*.

Clay testified that he could look up how many points he had on the computer whenever he wanted to and could see the reason he was given the points. Clay acknowledged that he knew if he

was assigned an attendance point that he disagreed with, he could dispute the point by contacting upper management. Clay testified that he knew he could be terminated for continued tardiness, or unauthorized or unexcused absenteeism. Clay knew he could also be fired for job abandonment if he failed to report to work two days in a row without calling. Clay also knew that if he earned 12 points under the attendance policy in 2009, he could be terminated. Further, Clay knew that AutoZone had a policy prohibiting disability discrimination and that he could complain to upper management if he believed he was being subjected to disability discrimination. Clay testified that he knew he could apply for a leave of absence, intermittent leave, or a reduced work schedule.

Clay received a number of points before the April 2009 implementation of attendance policy. Only attendance points awarded after the April 2009 rollout of the 12-point attendance policy count towards the 12-point termination threshold. See [280-3] at 82.

Clay testified that he was absent on May 1, 2009, May 30, 2009, and June 6, 2009, and was given points for these absences, and admitted that he cannot recall why he was absent. See [280-3] at 84. Nonetheless, Clay also wrote the reasons for his absence on a printed attendance report he made on July 6, 2009. See [271-1] at 31; [271-13]. This document indicates he was at the hospital on May 30, 2009, see *id.*, and Clay's medical records show he was being treated for kidney stones, see [271-2]. In addition, Clay's attendance report shows that the May 1 and May 30 occurrences were "excused," which, according to EEOC, shows that he provided AutoZone notice. *Id*. Although Clay did not recall the details of particular absences, he testified that whenever he received a doctor's note he gave it to Kellogg, but Kellogg "had a policy of throwing the damn things away." [271-1] at 28.] Kellogg did not recall getting any doctors' notes from Clay. See [293] at 8.

37

Clay testified that he was absent on June 8, 2009, June 9, 2009, July 1, 2009, and July 2, 2009 but could not recall why. See [271-1] at 37. He received one point for each date. See [271-7]. However, Clay's handwritten notes on his printed attendance sheet showed that he went to the hospital on June 8, 2009, see [271-1] at 39, [271-13]; he was visiting a medical center on July 1, see [271-8]; and he had a doctor's appointment on July 2 and was excused for July 3 and 4, see [271-1] at 38. He also had medical records from June 9, [271-4], July 1, [271-8], and July 2, [271-5].

According to medical records produced in this case, in July 2009 Clay was diagnosed with a herniated disc in his spine. Clay attributes the injury to a workplace incident. See [292] at 13-14. Clay testified that he told AutoZone he needed to be off work for two weeks due to his disability and provided a doctor's note to his manager, Kellogg, but Kellogg threw the note in the trash. Defendants dispute that Clay ever provided Kellogg with a note. See [292] at 15-16. Defendants also emphasize that neither they nor Clay's doctor have any record in their files about the purported note. Further, they point out that AutoZone's "clock in" records show that Kellogg worked a full shift on July 14 and two and a half hours on July 17. Clay had no explanation for those records "[o]ther that I would go into work and my back starting hurting me." [271-1] at 35.

Clay indicated there were a few times he "woke up and – [he] went to the doctor instead of going to work, yes." [280-3] at 87. Clay admitted that he would not give advance notice when he would leave his shift early and/or not report for work at all, and admitted that his failure to provide notice would leave the store short-handed if no one could cover for him. See *id*. The nature of Clay's disability is that he did not have advance notice of when his back pain would increase to the level that he needed leave. EEOC also maintains that AutoZone did not assign

points when employees left early, so permitting Clay to leave early would have simply treated him like everyone else. See [280-3] at 87.

Clay was terminated on August 4, 2009. Clay testified that he was informed of his termination by Kellogg and Smith, and that he had no knowledge regarding who made the decision to terminate him. Blyden decided to terminate Clay's employment, allegedly due to job abandonment and/or repeated violations of the attendance policy. See [280-3] at 91. It is disputed how many points Clay should have accumulated by that time. Defendants maintain that Clay had 39 attendance points. EEOC recognizes that Clay had 14 occurrences between the implementation of the policy and his termination in August 2009, but maintains that he provided a doctor's note to cover many of these absences, and was thus asking AutoZone to not award him points incurred because of disability related attendance occurred.

Clay admitted that he was able to perform his other job, a newspaper delivery driver, while working at AutoZone and even on the days he was absent from work at AutoZone. [280-3] at 90. EEOC states that Clay's job as a newspaper delivery driver only involved sitting in his car, but Clay actually testified that he had to "go to the warehouse, pick … up [the newspapers] and put them in [his] car." There were about 150 newspapers total, in bundles of 20, each of which weighed about 5 to 10 pounds. [265-5] at 116. Since being terminated from AutoZone in 2009, Clay has not been able to perform a job that requires continuous standing for two hours, but can stand for long periods of the day if he is allowed to sit down as necessary. See [280-3] at 90.

### b. Analysis

For the reasons that follow, Clay's failure to accommodate claim must go to a jury. Defendants argue that Clay is not a qualified individual with a disability because he "was either late or absent 19 times within eight months, many times without notice, and with many of his

tardies being due to long lunches—which he admitted were not due to any alleged disability."
[265-1] at 33. "He also admitted that whenever his back hurt, he would not report for work and/or
would leave early from his shift, without any advance notice." *Id.* Defendants conclude that,
"given Mr. Clay's inability to maintain regular attendance, and given how unreliable and erratic
his attendance was, the EEOC cannot establish that he was qualified for a Full-Time commercial
specialist position." *Id.*

That is one reasonable view of the record, but it is not the only one. When "a reasonable
accommodation was possible and the employer did not offer it," then responsibility for the failure
to accommodate "will lie with the party that caused the breakdown" in the interactive process.
*Williams*, 982 F.3d at 505. According to Clay's version of events, there was a clear breakdown in
the interactive process, which a reasonable juror could attribute to AutoZone. Clay testified that
he gave Kellogg doctor's notes explaining why he needed time off or should have absences
excused, but Kellogg threw them in the trash and assessed him points anyway. See [271-1] at 29.
Clay further testified that he complained to the District Manager, Smith, that Kellogg was throwing
away his notes but Smith told him to put up with it. *Id*. If Clay's testimony is to be believed,
AutoZone made no attempt to accommodate Clay's need for a limited amount of medical leave.

In addition, a reasonable factfinder could conclude that had Clay's disability-related
absences been forgiven, he could have continued to work at AutoZone. The Court cannot say as
a matter of law that Clay's attendance was so poor—or that his prospects of being able to attend
work consistently so remote—that he would be unable to work even with a reasonable
accommodation of a short period of leave. AutoZone's 12-point policy did not go into effect until
April 2009. Between April 2009 and his termination in July 2009, Clay accrued 31 points. But
EEOC has come forward with evidence that on all of the days Clay incurred points—except two,

on May 1 and June 6—Clay was either hospitalized, seeing a doctor, or had a doctor's note saying he could not work. This is consistent with the fact that nine of the absences are coded "sick/accident," suggesting Clay provided notice. According to Clay, for the last two weeks of his employment, he was instructed by his doctor to take two weeks off work to let his back heal. See [271-1] at 33. AutoZone gave Clay points (coding them as "excused – sick/accident" except for the final two occurrences where AutoZone assessed Clay 6 points each) each day he was on leave, resulting in a final total of 39 points. See [271-7]. Clay testified that he gave Kellogg a doctor's note stating that he needed two weeks off. [271-1] at 33. Blyden took him off the schedule. *Id*. During that two weeks, Blyden called him and asked if he was coming back to work. He said yes and was told to return on August 9. But when he returned on that day, he was terminated. *Id*.

Clay testified that he was ready to go back to work August 9. Although Defendants maintain that Clay demonstrated his inability to maintain regular attendance, there is little in the parties' briefs to illuminate whether Clay's attendance was likely to be as spotty going forward. Clay testified that his doctor advised him to take two weeks off to let his back heal, after which point presumably Clay could do his job. The record also shows that, since being terminated from AutoZone in 2009, Clay has not been able to perform a job that requires continuous standing for two hours, but can stand for long periods of the day if he is allowed to sit down as necessary. See [280-3] at 90. Defendants have not established that this would prevent him from standing a total of 80% of the time, which they claim to be an essential requirement of Clay's position. A reasonable factfinder could conclude based on the summary judgment record that Clay could do the job, if he was allowed to sit occasionally on a stool.

### 2. Gomez

#### a. Background

Ms. Gomez applied to work for AutoZone as a Part-Time employee in 2003. Records and testimony proffered by EEOC show that Gomez experienced migraine headaches two to three times per week. She started treatment for migraine headaches as early as February 20, 2006. Gomez experienced typical symptoms of migraine headaches, including sensitivity to light, visual auras, dizziness, and nausea. Gomez began treatment for her headaches as early as February 20, 2006 with Dr. Tehmina Bajwa. Dr. Bajwa prescribed medications and ordered a CT scan in 2007 and 2008 and an MRI scan in 2007. Gomez began treatment for her headaches with Dr. Majid Ali at least as early as January 21, 2009. On that date, Gomez reported to her doctor that she experienced two to three headaches per week, and that she sometimes experienced nausea, vomiting and visual auras with these headaches. Dr. Ali prescribed her Imitrex and Topamax for her headaches. Dr. Ali provided Ms. Gomez with a note recommending that she "work morning shifts, as second or third shifts provoked migraine headaches." [292] at 18.

When Gomez began at AutoZone in 2003, she was hired for a Part-Time position. Gomez testified that she knew that as a Part-Time sales employee with AutoZone, she could limit her availability to work at AutoZone just during certain days or hours of the day. Gomez testified that within four months of being hired, she was offered a Full Time position with AutoZone and, at that time back in 2003 or 2004, she learned that working Full Time meant that she had to be able to work any day and any and all hours the store was open. Gomez testified that she was promoted to a Full-Time PSM position at Store 2657 in approximately December 2005. Gomez testified that before she was promoted to a PSM position, she knew that a Full-Time PSM must be available to

work all shifts the store was open, seven days a week. EEOC disputes that such a policy was consistently implemented, and that PSMs had to be available to work all shifts. [280-3] at 20.

Gomez admitted that, as a PSM, she was responsible for supervising other employees. Gomez testified that she thought she did a good job both training and supervising the employees under her. Gomez testified that: (1) to train and supervise employees, she had to know what the company's policies and procedures were; (2) she knew the policies and procedures were contained in the company Handbook; and (3) that she received and read the company Handbook she received at the time of her hire and the updates that were published throughout her employment. Gomez testified that through receipt and review of the company Handbook, she was advised of the necessity to have good attendance and the company's expectation that employees should report for work on time and work all scheduled hours.

Gomez agreed with AutoZone that if an employee failed to show up for a shift or work all hours of the scheduled shift, that absence made it difficult on the remaining employees present at the store and would create a hardship with respect to customer service. Gomez further admitted that if only two employees were scheduled to work in the store, and one failed to show up, customers might leave the store due to poor customer service. Gomez testified she was asked to work on her days off when someone else was absent and that this happened "a lot of times." [280-3] at 22. Gomez admitted that she was not always able to come in to work to cover for another employee's absence. Gomez testified that "many times" she had to work later than she was scheduled because someone else failed to show up and that this situation created challenges for her. Gomez testified that she was also responsible for trying to call people to work when other employees did not show and that "most of the time" people did not want to come in to work to cover someone's absence. *Id*.

Gomez testified that she knew that in 2009 that AutoZone implemented an attendance point system and that if employees received 12 occurrence points during one year, they could be fired. Gomez knew that, per the policy, she would not get points for any absences or tardies that were: (a) covered by approved vacations; (b) for the third and any consecutive day of an absence due to an illness or injury that lasted three or more days; (c) covered by the company's short term disability policy; or (d) covered by FMLA leave. Gomez admitted that she knew: (a) how to apply for short-term disability leave; and (b) that she did so and received such leave in March 2008 for migraines.

Gomez testified that she knew vacation dates had to be approved in advance and that employees were supposed to request vacation dates before the next schedule was made so that managers could ensure the store was staffed properly. Nonetheless, EEOC points out, Defendants' attendance policy offers the possibility of applying available accrued vacation time to avoid receiving points due to an unplanned absence related to an injury or illness. [280-3] at 24. Gomez agreed that the store could not run if all managers were permitted to take vacation days at the same time. Gomez also testified to knowing about the company's corrective action policy and that she could be fired for continued tardiness, unauthorized and/or unexcused absenteeism and for any acts or conduct detrimental to an AutoZoner or customer of AutoZone. Gomez knew AutoZone had a policy dealing with equal employment opportunities for individuals with disabilities. She also admitted that she was aware that the company gave employees a problem-solving procedure to report any workplace issues.

Gomez testified that all the store managers she worked for reminded her that to be a Full-Time employee, she needed to have open availability, meaning she needed to be able to work any and all shifts the store was open. Nonetheless, EEOC points out that other Full-Time employees

Gomez worked with, including two PSMs, were not required by Alfredo (another store manager, see [280-3] at 25) to have open availability. Instead, he gave them set schedules (7 a.m. to 4 p.m., Monday through Friday). Those PSMs were not required to close the store, and Gomez was sometimes (she says often; Defendants say occasionally) made to close on a Friday night and then open the next morning. See *id*. Gomez testified that it would have helped her migraines not to have been scheduled to close one night and open the next morning.

Gomez testified that in 2008, she transferred stores to work at Store 2593, where Jill Olden (Olden") was the Store Manager. Gomez continued to work as a Full Time PSM. Gomez testified that Store 2593 did not have any Assistant Store Manager when she worked there, but there were 4 PSMs. See [280-3] at 27. Gomez testified that Store 2593 was open seven days a week from 7:00 a.m. to 9:00 or 10:00 p.m., and that a manager always had to be present when the store was open. Gomez testified that at Store 2593, there were only two people that worked a shift together, one manager and one sales employee. Gomez testified that only one PSM would be scheduled to work on a particular shift. Under Olden, at least three of the four PSMs opened and closed the store; she could not recall whether the fourth PM closed.

Gomez was granted short-term disability leave for migraines in March 2008. See [293] at 12. Defendants assert, and EEOC disputes for reasons explained below, that Gomez admitted that March 2008 was the only time in her employment at AutoZone that she applied for short-term disability leave. [280-3] at 23; see also [272-2] at 26. Gomez testified that in 2009 through 2010, she had frequent migraines. By "frequently" she meant she could have migraines every single day for 10 to 15 days at a time. [280-3] at 27. Gomez testified that whenever she got a migraine, she needed to: (1) rest and might also need to lie down; (2) stay home if she was dizzy or sick to her stomach; and/or (3) leave work in order to address the migraine symptoms.

45

Gomez saw an attendance report posted at Store 2593 every day and was able to see how many points she had any time that she worked in the store. Gomez testified that she knew she would not get a point for being absent if she found a manager to cover her shift or part of a shift if she needed to come to work late. Between January and June 2009, Gomez received a number of points for being absent, late for a shift, or late returning from lunch break. See [280-3] at 30-33. Gomez could not recall the specifics of the individual occurrences but testified that some days in 2009 she was late to work due to a migraine or did not clock back in from lunch at the scheduled time because she was experiencing a migraine. See [272-1] at 46. Gomez testified that she received points for these occurrences. See *id.*

Gomez testified that she signed a counseling notice in June of 2009, regarding her being absent or late on May 7, 2009, June 1, 2009, and June 13, 2009. See [280-3] at 33. On June 22, 2009, Gomez got a migraine headache that caused her to experience nausea. On June 23, she sought treatment at a clinic. The attending physician wrote a note excusing her from work. The June 22 and 23 absences were coded by AutoZone as "excused – sick/accident." *Id.* Gomez testified that she signed another counseling document from Olden, a first written warning, regarding being absent or late on June 13, 2009, June 22, 2009, and June 23, 2009. See *id.*

Sometime around June 2009, Gomez requested a change to Part-Time hours so she could avoid shifts that tended to provoke migraines. See [280-3] at 34. While Gomez states that she does not recall the schedule changing, see [280-3] at 34, Defendant's records show that Gomez switched to Part-Time status in late July 2009. While she was on Part-Time status, Gomez had one attendance occurrence, which was excused. See *id.* at 36. In the Fall of 2009, Gomez asked Defendants to return her to full-time status. This request was granted. Gomez admitted that she continued to know that Full-Time employees were required to be able to work any shift, any day

46

of the week and that she was not able to do this in the Fall of 2009, but EEOC disputes that full-time employees were actually required to be able to work any shift. See *id.*

Gomez admitted that in late November 2009, Olden gave her another counseling, a second written warning, because she already had eight attendance points due to her being absent or late on September 26, 2009, October 19, 2009, and October 21 2009, and failing to give any advance notice of being absent or tardy. However, EEOC disputes that Gomez did not give advance notice and points out that the three occurrences were all coded as "excused," which by definition means that Gomez gave advance notice. See [280-3] at 37.

Gomez further admitted that AutoZone's records show she was late to work by about half an hour on September 26, 2009, and that this was not due to any illness or doctor's visit. Gomez admitted that in December of 2009, Olden reviewed an attendance report with her to show her that she already had accumulated nine points and to express her concern for her employment given how important maintaining regular attendance was to the company.

Gomez filed a charge with the EEOC in January of 2010 alleging disability discrimination. Gomez claims to have spoken with Cleveland on the phone sometime before 2010 about her health. Gomez also recalls trying to speak with Cleveland another time in 2010 but reaching someone she believed to be Cleveland's secretary. See [280-3] at 38.

Gomez admitted that on February 28, 2010, Olden counseled her for being absent on January 14, 2010, February 11, 2010, and February 14, 2010, without giving any notice of the absence and/or lateness. Gomez admitted she was advised that this was a "serious violation" counseling and that, accordingly, she knew that she could be fired without any further warnings if she was late or absent again. EEOC questions the accuracy of Defendants' records. EEOC points

out that Gomez's February 11, 2010 occurrence was "excused," indicating that Gomez had, in fact, provided advance notice. See [280-3] at 38-39.

Gomez admitted that AutoZone's records show that she was late to her morning shifts on February 11 and 14, 2010, by approximately 15 minutes. She could not recall whether these absences were due to illness. See [280-3] at 39. When asked by defense counsel, Gomez agreed that she knew she could have been fired in February 2010 for poor attendance because during that 12-month period, she had accumulated 12.5 points. See [280-3] at 39. EEOC objects that defense counsel's questions were misleading and explains that Gomez was awarded no points between June 23, 2009 and September 26, 2009 – a period of 95 days—and therefore her oldest occurrence, a point from May 7, 2009, would have been forgiven and Gomez would not have accumulated 12.5 points by February 2010. See [280-3] at 39-40.

Gomez admitted that in early 2010, Olden spoke to her again about her attendance problems because, as of that date, she had already accumulated 11.5 points. Gomez also agreed that in March 2010 Olden told Gomez that she was concerned that Gomez had not given her a doctor's note supporting her requested schedules. But, EEOC points out, Gomez had previously given AutoZone such documentation (Gomez testified to giving two prior doctors' notes requesting scheduled changes to AutoZone in 2008), and Gomez presented Olden with another doctor's note on or around April 1, 2010. See [280-3] at 40; see also [272-1] at 19.

During her employment, Gomez gave a total of 2 or 3 doctors' notes to AutoZone regarding potential issues with scheduling—one or two in 2008 and one in 2010. See [280-3] at 40. A 2008 note indicates that the company needed to "discuss job flexibility" with Gomez, but did not contain any specific work restrictions. The note Gomez gave to her District Manager, Tom Baer, in April 2010 stated that the doctor recommended she have morning shifts because "second or third shifts

provoke migraines." *Id.* at 41. The parties disagree on how to interpret this note. Defendants claim that since Gomez knew that the second shift at AutoZone began at noon or 1:00 p.m. and lasted until 10:00 or 11:00 p.m.; therefore, it appeared that her doctor was recommending that she work only from 7:00 a.m. until noon or 1:00 p.m. EEOC states that an eight-hour shift that begins at 7:00 am would, with breaks, last until 4:00 and that the note therefore recommends that Gomez be allowed to work from 7:00 to 4:00, as she testified other PSMs were allowed to do. See [280-3] at 41. According to EEOC, neither Gomez nor her physician ever suggested that her working hours be limited to five hours per day.

Gomez admitted that AutoZone's records show that she returned from lunch late on May 1, 2010, and again on May 22, 2010, but she did not remember either of those days. EEOC points out that the "long lunch" on May 1 was due to "Management Change Due to Sales" and asserts that it should not have been considered in any discipline of Gomez. See [280-3] at 42. Gomez admitted that AutoZone's records show that she was two hours late to work on June 12, 2010, and further admitted she does not recall that lateness being due to any illness.

When questioned by defense counsel, Gomez admitted that she could have been fired in June of 2010, because during the 12-month preceding period she had accumulated 13.5 points. However, EEOC objects to counsel's questioning as misleading and maintains that "[b]ecause under Defendants' attendance policy points 'rolled off' after 12 months, only points between June 12, 2009 and June 12, 2010 would be relevant to Defendants' question," and "[d]uring this time period, Gomez was only assigned 9.5 points." [280-3] at 43.

Gomez admitted that on July 17, 2010, she took a lunch break and then called Olden from the break to say that she was not returning for the rest of her shift. Gomez further admitted that Olden told her that she would be in trouble for doing this because she had already earned so many

49

attendance points. Gomez could not recall whether her lateness was due to a disability. According to records, she then returned to work, only fifteen minutes after she was scheduled to return. See [280-3] at 43. According to Defendants, Gomez told Olden on this day that she wanted time off because she had house guests whom she did not want to leave unattended. [292] at 20. Gomez denies this.

Gomez worked the next day, July 18, 2010. On July 19, 2010, she called Olden to say she was not reporting for her shift that morning. Gomez admitted that at the time she called Olden, she knew that this absence would put her above 12 occurrence points. That day, Gomez was treated by her physician who noted that she had been experiencing a severe headache that had begun the prior week; she was experiencing dizziness and vomiting and rated her pain as a 10 out of 10. Her doctor released her to return to work on July 27, 2010, indicating that she needed only about a week of leave before she could resume her duties. [292] at 20. Gomez could not recall specific days on which she missed work or was late back from lunch due to migraines, but when Gomez returned to work after this absence, she had a doctor's note excusing her from work from July 19-27. See [280-3] at 44. Gomez testified that when she returned to work, Olden and her district manager told her that she was fired. Gomez could not remember whether she gave Olden and the district manager the doctor's note saying she was under a doctor's care from July 19 to July 27. [272-1] at 41 (Tr. 154:24-155:4).

Gomez testified that, in the weeks before she was fired, she asked Olden for a week of vacation time or other leave due to migraine headaches, but the request was denied. When asked why she did not apply for another leave of absence, Gomez testified: "Jill told me that—I applied for leave of absence, I applied for coming to—I talked to her. I didn't apply on paper or on the computer, I did talk to her that I needed some time off, that I needed either to change the schedule

or go part time with a different schedule. My point is that all this requests that I had because of my health issue, nobody ever listened to me, nobody helped me." [272-1] at 28. Gomez never applied for FMLA leave.

Cleveland was the RHRM who made the decision to terminate Gomez. It is disputed how many points Gomez had accumulated by the time she was fired. Defendants take the position that she had accumulated 19.5 points; EEOC claims the correct number is 13.5 because: "Two points were dropped due to 90-days of perfect attendance rule, and four dropped off due to the 12-month rolling rule. Defendant's records acknowledge that her final two points were due to illness or accident (Ex. Gomez 9, Gomez Attendance Record, D-000492-3), and she produced a doctor's note showing she was to be excused from work at that that time. (Ex. Gomez 10, Gomez Medical Record dated July 19, 2010, D-000047.) She averaged only about one occurrence per month in the twelve months before she was terminated, and she sustained several long periods of perfect attendance. Defendants' records show that at least one other point that Gomez received (October 21, 2009) was due to illness or accident (and there is no claim that she was involved in an accident on that date)." [280-3] at 45.

Cleveland testified that she had no knowledge that any of Gomez's repeated absences and tardiness issues were due to any alleged disability. Cleveland also testified that she had no knowledge of any request for an accommodation to the attendance policy that Gomez did or did not make based on any alleged disability. EEOC points out, though, that Cleveland also testified that under AutoZone's policies, disabled employees do not need to say "ADA" to request an accommodation or submit anything in writing and she would take action based on knowledge of a medical condition. EEOC takes the position that Gomez's two requests for schedule-based accommodations and the doctor's note she provided on or around July 29 were enough to put

51

Cleveland on notice that Gomez was getting points for disability- related occurrences, and did not want to get those points or to be fired.

### b.      Analysis

For the reasons that follow, Defendants are entitled to summary judgment on Gomez's retaliation claim but her failure to accommodate claim must go to a jury.

### i.      Failure to Accommodate

Defendants argue that Gomez is not a qualified individual with a disability because she was unable to maintain regular attendance and work any and all shifts that her AutoZone store was open throughout 2009 and 2010. According to Defendants, "Gomez admitted that she was either late or absent 27 separate times in 16 months (excluding the time she worked in Part-Time status), with most of her tardiness being due to taking long lunches—which she admitted were not due to her alleged disability." [265-1] at 23.

The Court cannot say as a matter of law that Gomez's attendance was so poor that she was unqualified to work at AutoZone with or without a reasonable accommodation. At the time she was terminated, Gomez had reached 13.5 points, which is close to the 12-point cut-off that AutoZone uses to determine when attendance issues become a terminable offense. Defendants' records show that Gomez's final two points, on July 19 and 20, 2010, were due to illness or accident. Although Gomez could not remember whether she gave the doctor's note to Olden on the day she came back to work and was terminated, medical records produced in the litigation show that on July 19, 2010, she was treated by her physician, who noted that she had been experiencing a severe headache that had begun the prior week, she was experiencing dizziness and vomiting, and she rated her pain as a 10 out of 10. Her doctor released her to return to work on

July 27, 2010, indicating that she needed only about a week of leave before she could have resumed her duties.

Defendants argue that even if Gomez had been granted this short term of leave, EEOC fails to demonstrate that this would have permitted Gomez to maintain regular attendance. See [290] at 31-32. Defendants point out that "Gomez admitted she had to quit her next employer after AutoZone because she continued to miss work unexpectedly throughout the Fall of 2010 and into 2011." [290] at 32. Actually, Gomez testified that after leaving AutoZone in July 2010 she worked for a number of temp agencies, and during that time she "was a lot better" and her headaches were "getting better." [272-1] at 43. Gomez started at Advance Auto in November 2010 as a part-time sales employee, but quit voluntarily after 40 days because she missed a lot of work due to migraines. She did not work in 2011 and 2012. *Id.* at 43-44. On this record, Gomez is not completely foreclosed from arguing that she would have been able to continue at AutoZone for some period without a reasonable accommodation, but the record does not support the award of damages from approximately November 2010 forward. The details of this limitation can be addressed in motions in limine, if this case proceeds to trial.

Next, Defendants argue that since Gomez was unable to identify any specific date for which she received an occurrence point that was allegedly caused by her disability, there is no way Cleveland, the decisionmaker who terminated Gomez, could have known that Gomez's attendance issues were due to a medical condition. But, for the reasons explained above, Cleveland is not necessarily the only relevant decisionmaker. Olden was also part of the interactive process, and she knew that Gomez suffered from migraines. Gomez testified that her migraines would last for "days and days and days" so "when the day comes that I don't show up to work," Olden would

know the reason because "I already told her so many days I'm working with a headache and the headache is getting worse." [272-1] at 30.

Defendants further maintain that the EEOC has no evidence Gomez ever requested any accommodation to the attendance policy due to an alleged disability. According to Defendants, Gomez "never sought to apply any FMLA or short term disability leave to any absence or tardy, despite her knowledge how to request such leave." [265-1] at 24. But in fact, Gomez testified that in the weeks before she was fired, she asked Olden for a week of vacation time or other leave due to migraine headaches, but the request was denied. When asked why she did not apply for another leave of absence, Gomez testified: "Jill told me that—I applied for leave of absence, I applied for coming to—I talked to her. I didn't apply on paper or on the computer, I did talk to her that I needed some time off, that I needed either to change the schedule *or* go part time with a different schedule. My point is that all this requests that I had because of my health issue, *nobody ever listened to me, nobody helped me*." [272-1] at 28 (emphasis added). A reasonable jury could conclude that Gomez requested assistance to accommodate her disability, but Defendants failed to engage in the interactive process to determine the appropriate accommodation. *Nehan*, 54 F. Supp. 3d at 975; see also *Malas*, 2019 WL 2743590, at *20–21 ("[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.'").

This leads to the issue of whether any reasonable accommodation was possible for Gomez's disability. Defendants assert that if "Gomez sought any accommodation to the attendance policy in the form of a request for an infinite amount of sick days and the ability to fail to come to work and/or leave work whenever she needed to due to her migraine, such would have been unreasonable as a matter of law." [265-1] at 25. EEOC responds that Gomez needed only

limited additional leave and could have continued to work. Due to factual disputes concerning how Gomez's disability limited her ability to work after she was terminated from AutoZone but before she began working at Advance Auto, the Court cannot say as a matter of law that the accommodation Gomez needed would have been unreasonable as a matter of law. Another potential reasonable accommodation supported by the record is to return Gomez to part-time status. According to Gomez, this is one of the accommodations she suggested to Olden shortly before she was terminated. Both parties recognize that Gomez's attendance improved when she had previously switched to Part-Time status.

The Court agrees with Defendants, however, that requiring AutoZone to relieve Gomez from the requirement that she be able to work rotating shifts would not be a reasonable accommodation on the record presented here. Defendants argue that Gomez is not entitled to the accommodation of a 7:00 a.m.- 4:00 p.m. Monday through Friday schedule because working a rotating shift is an essential function of the PSM job. In evaluating this argument, the Court takes into consideration Defendants' judgment, including any written job description, as well as "the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Rodrigo*, 879 F.3d at 241–42.

Defendants' policy was clearly expressed to employees and Gomez knew before she was promoted to a PSM position that a Full-Time PSM must be available to work all shifts the store was open, seven days a week. See [280-3] at 20. Gomez also knew that if she could not work rotating shifts, this would require other employees to rearrange their schedules and place strain on other managers. Gomez's store (Store 2593) did not have an assistant manager, so the manager and 3 to 4 PSMs were required to cover all shifts, 7:00 a.m. to 9:00 or 10:00 p.m. Monday through

Friday. There is no evidence that any PSM at Gomez's store—or anywhere in her region from 2008 on—was relieved of the requirement that they be available to work rotating shifts. The only evidence in the record arguably supporting EEOC's position is the fact that two PSMs at another store (Store 2257) allegedly had a 7:00 a.m. to 4:00 p.m. Monday through Friday schedule. The Court finds this insufficient to show that this would be a reasonable accommodation for Gomez, however, because Gomez's store had only had 3 or 4 PSMs and a store manager (4 or 5 total), while Store 2257 had five to 6 PSMs and an assistant manager and store manager (7 or 8 total). With so few management employees, the burden placed on Gomez's co-managers would be substantially greater. Under these facts, the Court finds it appropriate to defer to Defendants' judgment that the ability to work a rotating shift was an essential function of Gomez's position as a Full-Time PSM. See, e.g., *Smith*, 2019 WL 1515007, at *4 (employer entitled to summary judgment on whether overtime and out-of-shift work were essential to employee's position, where employer's judgment, the job description, and the employer's own work experience supported his position).

### ii. Retaliatory Discharge

In addition to its failure to accommodate claims, EEOC also brings a retaliatory discharge claim on behalf of Gomez. In order to survive summary judgment on this claim, Gomez "must identify evidence showing that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Guzman*, 884 F.3d at 642. "In deciding whether there is a genuine issue of material fact as to whether a plaintiff's protected activity caused her termination, we must 'consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation.'" *Parker v. Brooks Life Science, Inc.*, 39 F.4th 931, 936-37 (7th Cir. 2022) (quoting *King v. Ford Motor Co.*, 872 F.3d

833, 842 (7th Cir. 2017)). EEOC may use direct or circumstantial evidence. *Rowlands*, 901 F.3d at 801-802. "Circumstantial evidence of causation may include '(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.'" *Id*. at 937 (quoting *Rowlands*, 901 F.3d at 801).

Defendants argue that the six-month gap between filing her EEOC charge in January 2010 and being terminated in July 2010 is too long to support an inference that Cleveland terminated her in retaliation for filing the EEOC charge. Defendants point to cases in which the Seventh Circuit has affirmed summary judgment in cases involving shorter gaps. See [265-1] at 26-27 (citing *Yellow Freight Sys*., 253 F.3d at 952–53 (we agree with the district court that the temporal proximity of Nicosia's termination with his filing of an EEOC charge (some six weeks) is insufficient to establish retaliation"); *Jasmantas v. Subaru–Isuzu Auto., Inc*., 139 F.3d 1155, 1158 (7th Cir. 1998) (affirming summary judgment because a three-month gap between the filing of the EEOC charge and employee's discharge was insufficient where plaintiff presented no other evidence linking her filing of charge to termination)).

Apparently conceding this point, EEOC maintains that the relevant protected activity occurred not when Gomez filed her charge in January 2010, but when Gomez called "Sylvia" in HR and complained about Defendants' failure to provide the accommodation in the April 2010 doctor's note. See *Sentinel Insurance Co., Ltd. v. Serra Int'l*, 119 F. Supp. 3d 886, 891 (N.D. Ill. 2015) (party opposing summary judgment fails to "must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered," or "the claim is deemed waived and the nonmoving party will lose the motion"). But the record is too speculative to draw a causal

57

connection between that protected activity and Gomez's termination. Cleveland testified that she had no idea who "Sylvia" was and that there was no "Sylvia" in Human Resources in July 2010. Despite years of discovery, there is no indication that EEOC has ever determined who "Sylvia" is. There is no evidence that Gomez spoke with a Sylvia or anyone else about Gomez's July 2010 call to HR, which is fatal to the EEOC's ability to argue that Cleveland fired Gomez later that month due to the phone call. Therefore, Defendants are entitled to summary judgment in their favor on Gomez's retaliation claim.

### 3. Jackson

#### a. Background

Jackson worked for AutoZone at Store 303 in Missouri for about two months in 2009. Jackson was born with Hanhart syndrome, a condition that caused him to lose both of his feet, most of the tissue in his legs, and most of his left hand. He has no fingers on one hand and uses prosthetic legs to walk. Due to these physical impairments, Jackson cannot walk normally without prosthetics. Jackson testified that he has experienced difficulties throughout his life with finding the right prosthetics and is unable to walk without them. See [292] at 21.

Before working for AutoZone, Jackson had been a frequent customer of Store 303 and met the Store Manager, Lionel Moises ("Moises"). Based on his interactions prior to and during the job interview, Moises knew that Jackson wore prosthetic devices and did not have all of his fingers on his left hand. Jackson was a senior in high school while he worked for AutoZone, graduating in July 2009. He worked part time at AutoZone one or two days a week. Jackson knew that Store 303 only had two to three employees working at the store at one time and that one of those employees had to be a manager. He knew it was important that he be on time for his shift and

work throughout the entire shift and that, if he was going to be absent or late, he needed to try to find coverage for his shift.

Defendants' employment records show that from the time he began at AutoZone until his last day of work, June 22, Jackson was late three times and absent two time, when he traded shifts with other employees. See [280-3] at 93-94. It is disputed whether Jackson called Moises on June 25, 2009. Moises denies that the call ever occurred. See *id.* at 97; [292] at 22. Jackson, on the other hand, states that he told Moises that he had a staph infection on his legs and therefore would need to be out of work for five to six days or use a wheelchair at work. Jackson testified that Moises responded to Jackson's alleged notification by telling him that if he could not come in and perform the daily tasks, that he should not worry about coming back in because he would be terminated. See [292] at 23; [280-3] at 95-96. Jackson testified that he understood that he was terminated, while Defendants dispute this. See [292] at 25. Jackson testified that he could have performed nearly all of his job functions from a wheelchair, and that the only duty he could not have performed in a wheelchair involved getting parts by climbing a ladder. He testified he knew he could have asked another employee to help if that was needed. Jackson did not remember whether he was scheduled to work in the days following June 25. However, Defendants' records indicate that Jackson incurred attendance points for absences on June 25 and June 26, 2009. See [292] at 24.

Peetz was the individual who decided to terminate Jackson for job abandonment on or about July 7, 2009. At the time she made her decision, she was unaware that Jackson had any disability or had requested any accommodation related to the attendance policy due to a disability. After he was terminated, Jackson never contacted anyone at AutoZone to allege that he was terminated due to any disability or wrongfully terminated for any reason.

      **b.**      **Analysis**

Jackson's failure to accommodate claim also must go to a jury. Defendants argue that they are entitled to summary judgment on the notice element because it is undisputed that at the time she decided to discharge Jackson, Peetz had no knowledge that Jackson had any disability or had requested to have any time off from work due to any disability. But that does not necessarily absolve Defendants of liability for failure to accommodate Jackson's disability, since she is not the only potential relevant decisionmaker for the reasons explained above. Viewing the summary judgment record in the light most favorable to EEOC, a reasonable factfinder could conclude that Jackson told Moises about his disability and need for an accommodation, but AutoZone failed to engage in the interactive process and, as a result, the parties failed to identify a reasonable accommodation that would have allowed Jackson to keep his job: a limited amount of time off without incurring points.

Jackson testified that when he called Moises on June 25, Moises told him that he had nine points and if he did not come to work, he would exceed twelve points and be terminated. Jackson also testified that Moises told him that there was nothing he could do and that "[i]f you can't come in and perform the daily tasks, don't worry about coming back in." [292] at 23. EEOC argues that, "[w]ith this response, Moises effectively terminated Jackson, despite Jackson's explicit request for time off due to his disability and his willingness to come to work using a wheelchair." [280] at 32. On this record, the Court agrees with EEOC that it is up to a jury to determine whether Jackson provided sufficient notice of his disability and need for accommodation and to assign responsibility for any breakdown in the interactive process.

Defendants argue that even if Jackson did request time off as an accommodation, he was not entitled to it because he and Moises agreed in their depositions that Jackson could have worked

using a wheelchair, but Jackson chose not to do so. But Jackson took Moises' statements—statements that Moises denies even making—to mean that he was being terminated, not that it was okay for him to come in using a wheelchair. Whether Jackson's interpretation was reasonable is open for debate, and therefore an appropriate question for a jury.

Finally, Defendants argue that Jackson was not entitled to time off as a reasonable accommodation because no medical professional told him he needed time off due to a staph infection. However, this is in dispute based on Jackson's own testimony that he had a staph infection and had to keep his prosthetic off for five or six days. See [273-1] at 8. (Jackson's doctor was deposed and couldn't recall whether Jackson had a staph infection when he saw him on June 19, 2009. See [273-2] at 15.) While Jackson acknowledged based on his review of the medical records there was no note from around June 25 saying he needed to be off work for five to six days, he testified that he visited his prosthetist at Hanger Clinic around June 25. Hanger Clinic reported that it "had no records of service from April 1, 2009, through December 31, 2012." See [273-1] at 9. However, Jackson testified—based on his knowledge as a former employee of the Hanger Clinic—that records were only retained for seven years, so at the time of his deposition in 2018 records from before August 2011 may have been shredded. *Id.* Questions concerning Jackson's credibility are for the factfinder to decide. *Johnson*, 936 F.3d at 705. In addition, EEOC's theory of the case is that the interactive process broke down when Moises told Jackson not to come in. If Moises had engaged with Jackson, he could have requested a doctor's note as part of the interactive process, but could not "simply ignore Plaintiff's request for an accommodation until Plaintiff figured out that Defendant required medical documentation." *Malas*, 2019 WL 2743590, at *21.

### 4. Lindsey

#### a. Background

Lindsey was hired to work at Store 460 in Missouri on October 6, 2010, as a PartTime Sales person. Lindsey reported to Store Manager Jessica Isom ("Isom"). He admitted that they got along "fine" and that he had no problems with her. Upon hire, he received and read the employee Handbook. Lindsey knew that AutoZone had policies preventing disability discrimination and that he could report any alleged discrimination through multiple channels.

AutoZone's records indicate Lindsey had 6 occurrences where he was late 4 times and absent twice within a 5-and-a-half-month period. On April 10, 2011, Ms. Isom issued a "serious violation" Corrective Action Review to Lindsey because his register drawer was short by $75.81. [280-3] at 100. AutoZone's records show that Lindsey never returned to work after receiving this counseling. Although Lindsey testified to remembering to work at AutoZone after the write-up, he has no records of his own that would contradict AutoZone's. Lindsey's point-chart indicates that he did not have any attendance occurrences between April 5 and April 25, 2011. See [280-3] at 101.

Lindsey was diagnosed with Bell's Palsy around May 8, 2011, which caused lip swelling, facial paralysis, twisting mouth, speech difficulty, blurry vision and tearing. On May 9, 2011, Lindsey went to AutoZone to show Isom the records he obtained from his hospital visit. Lindsey testified that he intended to request a couple of days off until his face cleared up or allowed him to be able to work. See [292] at 31. Lindsey never handed Isom his hospital paperwork, which described Bell's Palsy and what Lindsey was experiencing. See [280-3] at 101. Due to his medical condition, Lindsey was physically unable to speak. See *id*. According to Defendants, Isom told Lindsey that "he was fired because he had not reported for work in a while." *Id*. Defendants

contend that Isom did not know about any medical condition Lindsey had, but EEOC disputes this on the basis that the condition was obvious because "Lindsey could not even physically speak because of his condition."  *Id*.  Lindsey testified that his facial paralysis subsided in about two weeks, after he received treatment with facial steroids.  Lindsey never sought to reapply to work at AutoZone.

Records from Lindsey's Full-Time employer during 2011, Schnuck's Bakery, indicated that he worked and received compensation for 31.5 hours of work he performed the entire week of May 8, 2011.  Those records show that throughout his entire employment at Schnuck's Bakery, including during the weeks of May 8 and 15, Lindsey worked there Mondays through Fridays, from 3:00 p.m. to 11 p.m. However, Lindsey does not recall working for Schnuck's during his first Bell's Palsy episode.  See [280-3] at 102.  Lindsey testified that his job at Schnuck's Bakery could be performed without having to talk to customers.

### b. Analysis

Lindsey's failure to accommodate claim also must go to a jury.  Defendants argue that the EEOC cannot establish that AutoZone knew of Lindsey's alleged disability or request for an accommodation before it made the decision to terminate him for job abandonment.  However, Defendants are extremely vague about when and why the decision to terminate Lindsey was made, which defeats their request for summary judgment on this element of the prima facie case.

Defendants contend that "Lindsey did not experience any medical issue and was not diagnosed with Bell's Palsy until May 8, 2011—nearly one month after he stopped reporting to work at AutoZone."  [265-1] at 37.  But it is not apparent from the record why Defendants would have believed as of May 8, 2011 that Lindsey had "stopped reporting to work."  AutoZone's points list for Lindsey shows that between April 10 (when he received corrective action) and May 8 (when

he was diagnosed with Bell's Palsy), Lindsey had been absent only once, on April 25, 2011; that absence was marked "unexcused – personal" and Lindsey was assigned 2 points.

Defendants further contend that Peetz, the individual who decided to terminate Lindsey, "obviously could not have known of any disability Mr. Lindsey had at the time she decided to terminate him for job abandonment (not for accruing 12 or more attendance points) because he did not have any such alleged disability at that time." [265-1] at 37. But it is not clear how Peetz could have made the decision to terminate Lindsey for job abandonment before May 9, 2011—which, according to AutoZone's points list, was the second consecutive day that Lindsey failed to call in or report for work. See [274-7]; see also [270-17] at 39 (Peetz testimony that she made the decision to terminate Lindsey and believes looking at his records that he was terminated for job abandonment for "multiple days of not contacting the store and absences"). Under AutoZone's policy, this would have been the day that Lindsey's employment would be "automatically terminated" for job abandonment. [280-3] at 9. Perhaps Lindsey did not show up on time on May 9, Peetz immediately approved Lindsey for termination, and Lindsey then showed up at the store to give Isom his doctor's note. Even then, a reasonable jury could find that "[a] few hours' tardiness" in providing an employer with notice of a disability and need for accommodation "should not be the reason for cutting off the interactive process and cutting off a person's rights under the ADA." *Bultemeyer*, 100 F.3d at 1286 (where employee provided doctor's note to employer a few hours after employer had decided to fire employee, employer "could have used the opportunity it presented to reconsider the decision to terminate his employment," which "would have been a proper way to engage in the interactive process"). In addition, Defendants' position that Peetz had made the decision to terminate Lindsey before Lindsey tried to tell Isom

about his disability on May 9, 2011 is undercut by AutoZone's records showing that Lindsey had an effective termination date of May 21, 2011. See [298] at 34, 35 n.9.

Viewing the summary judgment record in the light most favorable to EEOC, when Lindsey met with Isom on May 9, his disability was obvious based on his appearance and behavior. His face was red, visibly swollen, one side of his face was drooping, and he was drooling because he could not control his lips. His speech was slow and slurred. He carried medical paperwork in his hand and tried to give it to Isom, but she refused. He tried to write down why he missed work, but Isom told him he was terminated and did not ask about his condition or absence. These facts are sufficient to create a material factual dispute concerning whether AutoZone had notice that Lindsey was disabled and needed an accommodation. See *Sears, Roebuck*, 417 F.3d at 804 ("an employer cannot shield itself from liability by choosing not to follow up on an employee's request for assistance, or by intentionally remaining in the dark"); *Malas*, 2019 WL 2743590, at *20–21.

Defendants argue in the alternative that they are entitled to summary judgment because the record demonstrates that Lindsey did not need an accommodation for his Bell's Palsy. Defendants point out that "no doctor actually said he needed any time off from work in May of 2010" and "he was able to show up to work at his Full-Time job at a bakery during the time he claimed to have the Bell's Palsy episode (and, in fact, worked more than 30 hours during the time he claimed he was going to ask AutoZone to have off)." [265-1] at 37.

However, Isom terminated Lindsey without looking at the medical information or engaging in a discussion that could have led to a request for more medical information, if AutoZone thought it was necessary. And Defendants overlook testimony that Lindsey was able to work at the bakery, but not AutoZone, because "[t]he responsibilities at the two jobs were fundamentally different": "Where the bakery position did not require Lindsey to interact or socialize with others, his position

65

at AutoZone did." This is in contrast to the plaintiff in the case relied on by Defendants, *Spring-Weber v. City of Chicago*, 2018 WL 4616357 (N.D. Ill. Sept. 26, 2018), who "admitted that her Bell's palsy imposes no obstacle to her ability to perform the essential duties of a paramedic." *Id.* at *10. Whether Lindsey's Bell's palsy substantially limited his ability to work is a question for the factfinder.

### 5.    Lozada

#### a.    Background

Lozada worked at AutoZone's Store 5249 from 2007 until April 2009. Lozada has atrioventricular nodal re-entrant tachycardia ("AVNRT"), which causes a patient's heart rate "to rapidly increase" and leads to disabling "symptoms of palpitations, shortness of breath, and chest pain." [292] at 32. According to EEOC, AVNRT is "the most common form of supraventricular tachycardia (SVT)." [280] at 17. Lozada had shortness of breath for about six or seven years prior to 2009. Lozado testified that his condition affects his breathing, walking, and anything that requires physical exertion. When he is having heart palpitations, he needs to sit down to be able to "breathe better." Lozada experienced these SVT episodes only every few years. See [292] at 33.

Lozada testified that he was unfamiliar with any point system at AutoZone. Nonetheless, Lozada admitted that: (a) he knew it was important to show up for work; (b) failure to report to work could make it difficult on the employees who were at work and could harm the store's ability to provide good customer service; (c) he could be disciplined if he failed to report to work; and (d) if he was going to be absent, he needed to contact management at least an hour beforehand to let them know he could not be there. Lozada admitted that he knew that AutoZone would consider an employee to have abandoned his or her job if the employee did not report to work or call in for two consecutive days.

66

Lozada testified that he went to the hospital with chest pains on the morning of April 6, 2009, after experiencing chest pains while at work. It is disputed whether his medical condition was resolved at this time. Although he was not given any restrictions, when Lozada reported to work two days later (Wednesday April 8) after seeing his primary care physician, he had to leave after only an hour due to another recurring SVT episode. See [280-3] at 66-67. Lozada testified that he told the assistant manager "Doris" Garcia that he needed to go home. [293] at 24; see also [275-1] at 19. Lozada left early, went to see Dr. Dormitorio, and was absent from work for "about a week." [293] at 25.

Lozado's birthday was Sunday April 12; he recalled that David Garcia had brought him a birthday cake at work and guessed that this must have been the week before his birthday because he was off work on Sundays and Mondays. See [275-1] at 67-68. But he was unclear on the date. The night of his birthday, he celebrated with friends at a bar. See *id.* at 66. AutoZone's records show that Lozada was absent the next day, April 13, and against on April 15 and 17 and that he failed to call in or report for work. The absence on the 15th was marked "excused/accident," but the other days were marked "unexcused failure to report" and Lozada incurred points. See *id.* at 63. While Lozada testified at one point that he did not remember whether those absences were for a medical reason, see *id.* at 61-63, he also testified that he went back to work once he was feeling better (about a week after he went home ill on April 8), at which point he was told he was no longer employed. *Id.* at 21.

Lozada testified that AutoZone's records indicate he was absent on April 13, 2009—a Monday—and did not call the store. However, Lozada testified that he always had Monday off. Lozada testified that AutoZone's records indicated he was also absent his next two scheduled shifts on April 15 and April 17, 2009 and did not call the store. While Lozada testified at one point that

he did not remember whether those absences were for a medical reason, see [275-1] at 61-63, he also testified that he went back to work once he was feeling better (presumably around April 19), at which point he was told he was no longer employed. [275-1] at 21.

Lozada's store manager, Victor Garcia, testified that he called Lozada several times when Lozada had ceased reporting for work, but could not reach him. [280-3] at 69. Lozada denies this on the basis that he never received any calls or voicemail messages. See *id*. at 69-70. Victor Garcia then allegedly contacted Lozada's former store manager, David Garcia, and asked him to try to reach Lozada. *Id*. at 70. David Garcia testified that Lozada took his call and told him that he had "walked away" from work because he did not like the new store manager. *Id*. But Lozada denies ever talking to David Garcia during this period or telling him that he quit.

According to Lozada, he returned to AutoZone about a week after he had gone home with chest pains on April 8 and spoke to "David or Doris" in person and told them he was feeling better and wanted to return to work. Lozada was told that he was no longer employed by AutoZone. Defendants dispute this and take the position that Cleveland did not even decide to terminate Lozada for job abandonment until approximately April 19, 2009, after being informed of the company's multiple attempts to reach Lozada to no avail. It is disputed whether Lozada attempted to get his job back. Lozada testified that he called human resources shortly after he was fired in an attempt to continue working at AutoZone but they told him "there's nothing they can do." [280-3] at 72. Lozada also testified that when he would see AutoZone employee Rene Garcia after his termination, he would tell Garcia he wanted to go back to work. *Id*.

When he was deposed in this matter, Lozada testified that he had no idea why he was being deposed and had no idea what type of discrimination the EEOC was alleging in this litigation. Nonetheless, he also testified that he complained to someone in human resources after his

termination because they fired him after he experienced episodes of chest pain which prevented him from working. Lozada did not remember if a doctor has ever told him he had any disability. Lozada testified that no doctor ever placed any restrictions on his work, or told him he could not work or walk. However, he also testified that he needed to miss work due to his SVT episodes. Lozada testified that he was not disabled, and thus never reported any disability to AutoZone or any disability discrimination. [280-3] at 65.

      **b.**      **Analysis**

Lozada's failure to accommodate will also be allowed to proceed to a jury. Defendants first argue that even assuming that SVT is a disability, they cannot be held liable for failure to accommodate it because "Lozada did not receive this diagnoses and had no plan for treatment until five months after he was terminated by AutoZone for job abandonment in April of 2009." "Given the lack of treatment and diagnosis of any disability during his employment," Defendants maintain, "the EEOC cannot establish Lozada was a qualified individual with a disability." [290] at 38. Defendants rely on EEOC's expert report from Dr. Aggarwal for the proposition that "the first time Lozada was diagnosed with SVT was on September 16, 2009." *Id.* (citing [275-2]). However, the report shows that on "04/06/2009" Lozada "was diagnosed with a heart rhythm abnormality called supraventricular tachycardia" and on this date was given medications to slow his heart rate down and help with his symptoms of palpitations and chest pain." [275-2] at 3. "On 9/16/06 he went to the emergency room again and a heart rhythm specialist diagnosed him with supraventricular tachycardia with aberrant conduction, treated him with catheterization laboratory based study and ablation." *Id.* at 4. But that was not the first time he had been diagnosed or received a course of treatment; that was on April 6, when he went to the emergency room after experiencing chest pains while at work. Further, while Defendants suggest that Lozada could not

have returned to work until after his September 15 diagnosis, Lozada testified that he was ready to return to work about a week after April 8, 2009. There is nothing in the record showing that Lozada's SVT prevented him from working between April and September 2006, as he had done for the previous two years. According to the record, he experienced these SVT episodes only every few years. See [292] at 33. Lozada testified that after he was terminated from AutoZone, he chose not to look for other employment because he was 68 and received Social Security, not because he was unable to work.

Defendants also move for summary judgment on the basis that Lozada never reported any disability to AutoZone or asked for any sort of accommodation in any form. However, when all facts and inferences arising from them are construed in EEOC's favor, a reasonable factfinder could conclude that Lozada provided sufficient notice of his disability and need for an accommodation, triggering the ADA's interactive process. When Lozada left work to go to the emergency room on April 6, 2009, medical workers informed him that they would call AutoZone to tell management of his whereabouts. They apparently did, because AutoZone did not assign Lozada any points when he left for the ER on April 6, 2009 or for the rest of that week. When Lozada went back to work on April 8 but had to leave, he told the assistant manager that he was having chest pain and needed to take time off work. A reasonable factfinder could conclude based on this record that Lozada's actions, even if "ambiguous as to the precise nature of the disability or desired accommodation," were "sufficient to notify the employer that the employee may have a disability that requires accommodation," and therefore Defendants should have "ask[ed] for clarification." *Sears, Roebuck*, 417 F.3d at 804. The fact that Lozada was marked "excused – sick/accident" on April 14 (but not on the 13th, when he earned six points) suggests that Defendants were aware Lozada was suffering from a medical condition. Yet there is no indication

70

that Lozada was asked for documentation or that AutoZone took any action to begin an interactive process to determine any appropriate accommodation. According to Lozada's version of the facts (which Defendants dispute), no one at AutoZone reached out to him in the week he was out. He simply found out when he returned to the store a week later to ask that he be scheduled again that he had been fired, and when he called HR to complain he was told there was nothing they could do.

Viewed in the light most favorable to EEOC, the summary judgment record also is sufficient for a reasonable factfinder to conclude that Lozada's managers and supervisors failed to engage in the interactive process, and as a result the parties failed to agree to a possible, reasonable accommodation. See *McAllister*, 983 F.3d at 972; *Igasaki*, 988 F.3d at 961; *Malas*, 2019 WL 2743590, at *21. While Lozada did not "identify [a] particular accommodation"—or even know about AutoZone's attendance policy—"in this case, the accommodation was obvious": Defendants could have excused the points that Lozada incurred during the week he was recovering from his SVT episode. *Sullivan v. Spee-Dee Delivery Service, Inc*., 138 F. Supp. 3d 1050, 1058 (W.D. Wis. 2015). As explained above, Lozada testified that he felt better and was ready to return to work in about a week. The Seventh Circuit has recognized that such a short leave of absence may be a potential reasonable accommodation under appropriate circumstances. See *Severson*, 872 F.3d at 481. The Court cannot say as a matter of law that such an accommodation would be inappropriate here, given Lozada's relatively long tenure and clean attendance record at AutoZone.

### 6. Matasar

#### a. Background

Matasar has had Type 1 diabetes for over 30 years. The symptoms of hypoglycemia vary in severity and include sweating, increased hunger, blurry vision, changes in speech, shaking,

elevated heartrate, changes in mental state and consciousness, convulsion, and seizure. Matasar testified that during these episodes, he has had difficulty speaking, loss of consciousness, and felt like his brain "doesn't work." [292] at 35. Matasar has episodes of hyper- and hypoglycemia because he has "brittle diabetes," a condition of severe fluctuations in blood glucose which impacts day-to-day life. See *id.* He also had gastroparesis and experienced its symptoms frequently, such as nausea and severe vomiting that required medical attention. His doctor testified that Matasar had "frequent doctor's visits and hospital admissions due to low blood sugar" and "frequent" "digestive trouble." *Id.* Gastric distress of any origin in complicated in a diabetes patient because of the need to eat regularly to help control blood sugar levels; consequently, a diabetes patient may need to seek medical intervention for gastric ailments, such as stomach flu, that other people would not.

Matasar applied for and received a Full-Time Driver position with AutoZone in 2006. Matasar admitted that at the time he was hired, he understood that being employed on a Full-Time status meant that he had to be able to work whatever hours the company needed him to work. Around 2007, Matasar transferred to the Naperville, Illinois store and, shortly after being transferred, was promoted to a PSM position. Matasar was then transferred to the Morris, Illinois store as a Full-Time PSM. Matasar admitted that he knew that as a Full-Time PSM, he needed to be able to work any and all shifts that the store was open and had to work rotating schedules, meaning sometimes he would close the store, sometimes he would open the store, and sometimes he would need to work a mid-shift. Matasar testified that his duties as a PSM were "[b]asically the same as a store manager, opening, closing balancing cash drawers, assigning duties to employees and then working with customers." [280-3] at 48. Matasar further testified that as a PSM, he had his own, unique password, and that password gave him access to documents and

functions that non-manager employees did not have. Matasar testified that only managers, such as PSMs and Store Managers, could perform certain tasks, such as completing a Manager's Next Day Review and processing returns. Matasar testified that his duties as a PSM also included managing the employees and training them on and ensuring their compliance with the company's policies and procedures.

Matasar testified that if the Store Manager (or Assistant Store Manager, if the store had that position) were not present, he, as the PSM, would be the highest-ranking manager. He further testified that he was the highest-ranking manager at the store "a lot of times." [280-3] at 49. Matasar acknowledged that: (a) he knew the company's policies and procedures well; (b) he knew the company handbook was on line for him to consult any time he wanted to; and (c) he printed out a hard copy of the company handbook shortly after he started working at the Ottawa store. Matasar admitted that he knew that: (a) the company expected employees to report for work all scheduled hours; (b) this expectation of the company was reasonable; and (c) that attendance was an important part of his job. Matasar further admitted that all the work he did as a PSM had to be performed at the store. Matasar agreed that if an employee was late to work, it would create problems for other employees and could jeopardize customer service. Matasar testified that he knew that if he could not report to work, report to work on time, or have to leave early, then he was supposed to give a manager at least an hour's notice. Matasar admitted that if someone did not show up to work, managers had to call other employees to see if they could work that shift or managers might have to stay late to cover the absence of the missing employee. Matasar acknowledged that he was asked to come into work on his days off, to come in early and/or to stay late to cover the absence of another manager, but that he could not always do so. He also admitted

73

that, as a PSM, he had to call other managers and employees to try to get them to come in when other employees were absent or late, but that he could not always find coverage.

Matasar testified that he transferred multiple times, and eventually ended up in the Ottawa, Illinois store, where he worked until he was terminated. Matasar testified that when he first started working in Ottawa, there was one other Full-Time PSM, a Store Manager, and an Assistant Store Manager. Matasar further testified that, shortly thereafter, another individual became a Full-Time PSM, so there were two Full-Time PSMs in addition to Matasar. Matasar testified that the Ottawa store was open seven days a week from around 7:00 or 8:00 a.m. until 8:00 or 9:00 p.m. Matasar admitted that a manager needed to be working whenever the store was open and that he and the other two PSMs needed to ensure the store was staffed with a manager. See [280-3] at 51. The store was often staffed by only two people at night, but there would be more working during the day. See *id*. at 52.

Matasar testified that in February, April, September, and December 2008, his Store Manager, Jeff Reed ("Reed"), issued multiple counselings and warnings to him about his failure to maintain regular attendance. See [280-3] at 52. Reed's counselings indicated that Matasar had not given any doctor's notes regarding these absences and/or tardies. Matasar testified that he did not recall specific absences or tardies in 2008 or whether he provided advance notice. See *id*. Matasar testified that Brian Lucas ("Lucas") became the Store Manager of the Ottawa store in late 2008 or early 2009. Matasar testified to one occasion in 2008 and on one occasion in 2009 where his manager "expressed… that a lack of regular attendance was a problem for him…." [280-3] at 53.

Matasar testified that he knew in 2009 that the company began formally tracking attendance over a rolling 12-month period and that if he had perfect attendance for 90 consecutive

74

days, the oldest attendance point would drop off. He also knew that he could see how many attendance points he had any time he wanted to by looking on the computer and that he would receive double the number of points for being absent or late on weekends. Matasar admitted that he knew that customer traffic was busier on weekends than during the week and that it would be more difficult to find employees and managers to cover these shifts. While it is disputed whether Matasar knew he would not get points for FMLA leave or how to apply for FMLA leave, it is undisputed that he never applied for FMLA.

Matasar knew that he would not receive any attendance points for any approved vacation, and that he knew that he needed to request vacation time before the following week's schedule was created in order to ensure appropriate staffing. Matasar additionally admitted that he knew he would not receive any attendance points for any intermittent or full leaves of absence, and that he never applied for any leave of absence. However, EEOC states that it is not clear from the testimony cited what "intermittent or full leave leaves of absence" meant. While he did not use the words leave of absence, and points out that Matasar did request that the company excuse the points awarded for certain absences because of his disability. [280-3] at 54.

Matasar admitted that he knew AutoZone had a policy prohibiting disability discrimination and that employees could notify their managers, Human Resources, or AutoZone Relations of their disability and could make a request for an accommodation. However, Matasar testified that AutoZone did not follow its policy. [280-3] at 54.

Matasar testified that he could not give advance notice of being absent or tardy if he was in diabetic shock because his mind would not work, and he could not call or speak to anyone. Matasar testified that no doctor has ever said he needed any work accommodation due to his diabetes and, thus, he never gave AutoZone any medical documentation saying he needed any

accommodation to the attendance policy due to diabetes. See [280-3] at 55. Nonetheless, Matasar's doctors' notes do indicate there were periods of time when Matasar was incapable of working and then released him to return to work. *Id*.[7]

Matasar testified that when Lucas became the Store Manager, he told all employees that they needed to eat food in the back of the store, the break area, rather than in the office. Lucas also required that employees only eat during breaks. See [280-3] at 56. Matasar testified that, due to his diabetes, he asked his District Manager and Human Resources Manager to be allowed to have food around and admitted that he was permitted to have food near him within a few days of his request. Matasar testified that his store manager had a rule that employees could only eat in the break room. After he complained, he was told that he could eat in the store, but not in front of customers. He further testified that if he was the only manager on duty, he could not eat in the break room and leave the store or any associates unattended. Even with this accommodation, Matasar was at risk of violating his manager's policy if he needed to take a small piece of candy or sip of juice if he was the only manager on duty and a customer was in the store. Matasar admitted that he understood it was not appropriate to eat in front of customers or to eat in the office, which needed to be kept clean.

Matasar testified that he received two points for being absent on February 12, 2009, and that he does not know whether he had a doctor's note for that absence or whether he gave any advance notice of his absence. However, medical records show that Matasar was transported via ambulance to the hospital due to an episode of diabetic shock. See [280-3] at 57. Matasar testified that he received another two points for being absent on March 8, 2009, and did not recall going to

---

[77] For example, Matasar's doctor's note of May 13, 2009, released him to return to work on May 15, 2009; a subsequent note dated May 15th released him to return to work May 18, 2009. Therefore, Matasar was fully restricted from working for five days; a note from November 30, 2009, released Matasar to return to work on that date, and asked that he be excused from work on November 28, 2009. *Id*.

see any doctor that day. However, medical records show that Matasar was admitted overnight in the emergency room due to an episode of diabetic shock. See [280-3] at 57. Matasar testified he received another point for being absent on March 9, 2009. It is disputed whether Matasar provided Defendants with adequate notice of the reason for his absence. Defendants emphasize that the doctors' note Matasar provided does not indicate what he had been seen for or identify any work restrictions. EEOC emphasizes that Matasar's absences for March 8-9 were coded as "excused sick/accident," indicating that Matasar did provide adequate notice. [280-3] at 58.

Matasar testified that he received another point for his absence on May 14, 2009. He could not recall whether he had given advance notice, but medical records from this date show that Matasar had been unwell with gastrointestinal issues for 2 days prior to visiting his doctor on May 13, 2009. See [280-3] at 58; see also [292] at 37. The doctor provided him with a note excusing him from work until May 15, 2009. EEOC points out that Matasar's absence on May 13, 2009 was coded as "excused sick/accident" indicating that Matasar had given adequate notice of his absence and had provided AutoZone with the reason for the absence. See [280-3] at 58. Matasar testified that he received two points for being absent on July 24, 2009. Medical records show that on this day, Matasar was visiting his doctor for his diabetes. The doctor provided him with a note excusing him from work until July 27, 2009. Matasar's absence on July 24, 2009 was coded as "excused sick/accident" indicating that Matasar had given adequate notice of his absence and had provided AutoZone with the reason for the absence. See [280-3] at 59.

Matasar testified that he received another two points for being absent on July 26, 2009. This absence was also coded "excused sick/accident." Matasar testified that AutoZone's records show he was absent on July 29, 2009. Matasar testified that he was late to work on July 31, 2009, and received two points. Matasar further testified that he could not recall whether he gave any

advance notice that he would be late.  Matasar admitted that in the Summer of 2009, he received counseling from Lucas for being late and absent.  Matasar admitted that he knew as of July of 2009, he had already accumulated eight points.

Defendants' records show that Matasar was about 20 minutes late returning from lunch on August 18, 2009.  Matasar testified that while he did not have a specific recollection of that day, he remembered calling his manager to tell them when he was having trouble with his diabetes at lunch. He was told by his manager to take extra time.  [280-3] at 60. Matasar testified that AutoZone's records show he was 20 minutes late arriving to work on October 1, 2009, and, if there is no doctor's note pertaining to this day, he does not think he went to the doctor.  Defendants' records indicate, and Matasar does not dispute, that in October 2009  Lucas counseled him again regarding his attendance problems and warned him that he had already accumulated 10 points. [280-3] at 60.

Defendants' records indicate that Matasar left work early on November 28, 2009, clocking out for lunch but not clocking back in.  See [280-3] at 61.  Matasar saw a doctor the following day and obtained a note releasing him to return to work on November 30, 2009 and excusing him for missing work on November 28, 2009.  On the 29th, Matasar was treated for his diabetes, including increasing neuropathy, as well as back pain due to a long-standing spinal issue.  See [280-3] at 61.

Defendants terminated Matasar, but the timing and reason for the termination are disputed. EEOC says that the termination occurred on or shortly after November 28, 2009; Matasar testified that he was terminated in December 2009; and AutoZone says the decision to terminate was made by Cleveland around December 3, 2009.  EEOC takes the position, based on a corrective action form, that Matasar was terminated for reaching the twelve-point limit.  Defendants contend instead

that Matasar was terminated for absenteeism, due to his failure to return from lunch on November 28, 2009.  See [292] at 36-37.

It is disputed whether, at the time of his termination, Matasar had reached the twelve point limit.  Defendants' records show that five of Matasar's points were for "sick/accident" and Matasar's medical records show he was experiencing diabetes related illness on dates that account for at least four of his attendance points.  [292] at 37-38.  Defendants dispute that Matasar provided notice that these occurrences were due to a disability or that he needed an accommodation.

The parties also dispute what accommodation Matasar would have wanted for his disability.  Defendants state that Matasar testified that the accommodation he would have wanted from AutoZone regarding attendance was to be given an indefinite and unlimited number of absences (or not get any points for absences) for any doctor's visit related to his alleged disability, diabetes.  EEOC states that instead, Matasar asked "if there was any arrangements that could be worked out due to my diabetes and my doctors' notes."  [280-3] at 62.  Matasar did not ask his Store Manager, District Manager, or the RHRM to be given an indefinite number of absences.  See [292] at 37.

Defendants maintain, but EEOC disputes, that Cleveland—the individual who decided to terminate Matasar—had no knowledge that any absence or tardiness by Matasar was due to any alleged disability.  See [280-3] at 63.  EEOC points out that Cleveland testified that all doctor's notes should be shared with her, see [270-1] at 5, and admitted that she was aware of Matasar's diabetes, *id.* at 10.  Matasar testified that prior to his termination, he called Cleveland and one of the topics they discussed was that store manager Lucas was not sending her Matasar's doctor's notes.  See [276-1] at 18-19.  Despite this complaint, Cleveland testified that though she received a copy at the time it was prepared, she never saw Matasar's performance appraisal, on which Lucas

had written "you were told that your diabetes is not an excuse to miss work. It is a controllable disease" until she reviewed it as part of this litigation. [270-1] at 43. Matasar also called Cleveland after he was fired and asked about the attendance policy and why he was still being written up when he had doctor's notes. He does not recall Cleveland asking him what led to his having doctor's notes, he only recalls her telling him that this was just AutoZone's attendance policy. [276-1] at 19.

### b.     Analysis

Matasar's failure to accommodate claim also must go to a jury. Defendants argue that they are entitled to summary judgment because Matasar is unable to perform an essential function of his job—regular attendance—with or without an accommodation. Defendants contend that given Matasar's inability to maintain regular attendance, and given how unreliable and erratic his attendance was, EEOC cannot establish that he was qualified for a Full-Time Parts Sales Manager position with or without a reasonable accommodation. There are factual disputes that prevent the Court from entering summary judgment on this basis.

There is a material factual dispute concerning how many of Matasar's absences were caused by his diabetes. Defendants point out that Matasar was unable to identify any specific absence for which he received a point and that was allegedly caused by his disability. However, EEOC points to Matasar's medical records showing that he was experiencing diabetes-related illness (such as diabetic shock) on dates that account for at least four of his attendance points. [292] at 37-38. It is understandable that Matasar may not have remembered the exact date of particular absences since his deposition did not occur until years later. Viewing the record in the light most favorable to EEOC, Matasar had just reached 12 points at the time he was terminated, and four of those points were for diabetes-related absences. According to EEOC, he had averaged

only one occurrence per month from the time the attendance policy was enacted to his termination. [292] at 38. (Defendants dispute this and maintain that Matasar was actually late or absent 15 times in 6 months, but didn't received points for all those occurrences "due to the reason codes entered." *Id*.)

There is also a material factual dispute concerning how Matasar's disability could be expected to affect his ability to attend work going forward. Defendants point out that Matasar was either late or absent at least 15 times in 23 months with most of his points assessed for being late returning from lunch, which he admitted was not due to his alleged disability. However, the attendance problems in cases where summary judgment for the employer was granted have typically been more extreme. *Preddie*, 799 F.3d at 814 (teacher absent 23 times in one school year); *Amadio*, 238 F.3d at 98 (23 medical leaves during three years of employment, totaling over 18 months of absence); *Jovanovic*, 201 F.3d at 900 (24 days of absences in 12 months); *Moore-Fotso*, 211 F. Supp. 3d at 1026 (teacher was absent or tardy 78 times her first year and 52 times her second year).; *Basta*, 872 F. Supp. 2d at 709 (medical leave that ended up lasting 14 months). Matasar was terminated right after reaching 12 points. Matasar's attendance was not exemplary, but the Court is not prepared to say as a matter of law that his diminished ability to attend work rendered him unqualified for his position or that refraining from awarding points for his disability-related absences would not be a reasonable accommodation under the circumstances.

Defendants also move for summary judgment on the second element of failure to accommodate, that the employer was aware of the employee's disability. Defendants argue that Matasar never gave AutoZone any documentation stating that he needed any accommodation to the attendance policy due to having diabetes and, therefore, EEOC cannot demonstrate that Matasar requested any accommodation to the attendance policy due to his diabetes. But this is

81

only one view of the record. When it is viewed in the light most favorable to EEOC, Defendants are not entitled to summary judgment. As EEOC points out, there is evidence that two of Matasar's supervisors (Lucas and Noe) and the RHRM (Cleveland) all knew that Matasar had diabetes. The record shows that Lucas alluded to Matasar's diabetes and "health concerns" in two performance reviews. After Matasar received these negative remarks, he asked Lucas if there were any "arrangements" that could be made due to his diabetes and doctors' notes. [292] at 37. According to Matasar, Lucas dismissed this request by saying his doctor "would probably write a note … for anything." *Id.* Matasar complained to Cleveland that Lucas had penalized him for attendance issues related to his diabetes. See [280] at 51-52. Viewing the record as a whole and in the light most favorable to EEOC, a reasonable jury could conclude that Matasar telling three members of management about his diabetes and requesting accommodations for that diabetes put AutoZone on notice of Matasar's disability and his need for flexibility in attendance.

### 7. Robbins

#### a. Background

Robbins was employed by AutoZoners in the St. Louis region. Peetz was the RHRM in that region and had responsibility for the store where Robbins worked. Robbins claims that his disability is having migraines, which come on unexpectedly and unpredictably and cause nose bleeds, nausea, vomiting, and sensitivity to light and sound. [292] at 39. Robbins testified that at times he could work through the pain with the help of Excedrin, but during extreme migraines, which occurred a few times a month, it felt like he was "being hit repeatedly in the head with a bat" and he was not able to do anything. See *id.* at 40. Defendants dispute that Robbins has ever been diagnosed with migraines or actually suffers from them, because none of his medical records mention migraines. See *id.* at 38-39.

Robbins worked for AutoZone on two separate occasions, the first in 2009. Robbins was 19 years old at that time. While Robbins was shopping at AutoZone, a Store Manager named Andre Cormier ("Cormier") offered Robbins a job as a PSM at Store 217. As a PSM, Robbins had a key to the store, and was responsible, along with another manager, for opening and closing the store. See [280-3] at 103. Robbins knew that there had to be a manager in the store for the store to be open and that if he was scheduled to open and was late, the store would not open on time. But, he clarified, since he was sometimes scheduled to work with another manager as well as other associates, if one manager were late, but the other manager and an associate were present, the store could open on time. Robbins also knew that as a manager, part of his job included following policies and procedures and ensuring subordinates did the same. Robbins admitted that to follow the policies and ensure others did so, he would have to know them. Robbins testified that if any employee was late, absent, or left work early, that disrupted store operations, jeopardized customer service, and created challenges for other employees. Robbins knew AutoZone expected employees to show up on time for their shifts and to leave work when scheduled to do so. He knew that the store needed to ensure there was coverage whenever an employee took lunch. He also knew that as a manager and keyholder, it was very important that he arrive to work on time and worked his full schedule. Robbins admitted it was reasonable for AutoZone to expect him to come to work on time.

In addition, Robbins understood that AutoZone used a point system to track attendance policy violations. Robbins knew that if an employee earned 12 points, he could be terminated. Robbins admitted that he was late quite often during his first stint of employment and earned many points for this. Due to the passage of time, with the exception of his first two days of work and his last day, Robbins could not recall the specifics of any of his attendance occurrences. See [280-

3] at 105. His first day was May 20, 2009. Robbins testified that on this day he experienced a migraine headache and was allowed to take a long lunch until the pain subsided enough that he could go back to work. More specifically, Robbins testified that his headache was "so bad to the point that I vomited in the store right in front of customers." [277-1] at 26. Robbins told his assistant manager, Vivian Johnson, that he had a migraine and she said it was ok to take a long lunch. *Id.* Robbins received a half point for returning to work late; this occurrence was coded "excused personal." See [292] at 41. On May 21, 2009, Robbins was 17 minutes late to work. Robbins testified that it was because he was still not feeling well. See [292] at 41. Robbins received another half-point for this occurrence, which was also coded "excused personal." *Id.*

As to dates Robbins could not specifically recall or explain why he was absent or tardy, Defendants' records show: Robbins was late on May 23, 2009, and could not recall why. On June 5, Robbins was late to work and late returning for lunch. Robbins was late returning from lunch on June 6, 2009. On June 7, 2009, Robbins was again both late to work for the start of his scheduled shift and late returning from lunch. Robbins was late on June 8, 2009 and June 9, 2009, and cannot recall why. Robbins was late on June 19, 2009, and June 20, 2009. Defendants' records show the reason was "management change due to sales" and Robbins did not incur any points. See [280-3] at 106. Robbins was late on July 24 and 25, and August 1, 2009. Robbins was late again on August 11 and 14 but did not receive any points. Robbins was late returning from lunch on August 27, 2009 and three hours late on August 30, 2009, and did not know why.

Robbins was an hour late on September 3, 2009, and claims he can recall that this particular tardy was due to a migraine. Robbins was told on September 3, 2009 that he was terminated. See [280-3] at 108. Defendants maintain, however, that Robbins was terminated on September 10, 2009 due to absenteeism. See [277-3]. It is disputed how many points Robbins had accrued at the

time of his termination. Defendants take the position that he had 44 points, relying on his attendance report, [277-2]. But the point total of 44 appears to include Robbins' subsequent employment with AutoZone in 2010-2011, as well as dates in 2009 that occurred after Robbins had already been terminated. See *id*. According to EEOC, the attendance report shows that between May 20, 2009 and September 3, 2009 (when Robbins testified he was told he was being terminated), he had accumulated exactly twelve points. The exhibit then shows six more points being assigned on September 5th and again on September 6th, for not appearing for work after he had already been fired.

After his termination, Robbins tried to contact his Regional Manager but did not contact the District Manager, Human Resources, or the toll-free hotline to complain about the attendance points he had received. Aubrey Logan ("Logan"), a new store manager at Store 217, offered to re-hire Robbins. Robbins was rehired on November 15, 2010, as a PSM at Store 217. As with his first stint of employment, Robbins knew he was expected to follow and enforce AutoZone policies and procedures. Robbins also continued to know that AutoZone expected him to report to work on time and work all scheduled shifts. He did not want to be terminated due to attendance again.

It is disputed whether Robbins' new managers were aware of his difficulty with migraines. Defendants claim that Robbins never told any manager at AutoZone that he had a migraine at any point during his employment, see [292] at 44, but Robbins testified that after he was rehired and before he began orientation, he spoke with Gina Jackson on the phone to "reconfirm the fact that I told her I had migraine headaches and I know that those affect my job performance. I didn't want it to be an issue. And she told me she understands, she's had health problems in the past, and the biggest thing is just being open and upfront, and to keep an open line of communication, there

85

shouldn't be any issues." [277-1] at 37. Robbins also testified that he had an earlier conversation with Jackson and Logan and they both knew he had migraines. *Id.*

During his second period of work at AutoZone, which lasted a bit more than ten weeks, Robbins incurred ten occurrences, approximately one per week; of these he was tardy but worked on six of them. Three of these occurrences were coded "sick/accident." See [292] at 44. In particular, on November 24, 2010, Robbins was late by approximately an hour. He was late again on November 28 and did not know why. Robbins testified that he was late returning from work on December 2 due to a migraine. Robbins was absent December 7 and 8. This absence was coded as "excused sick/accident." [280-3] at 110. Robbins was late on December 9 and did not know why. Robbins was absent on December 14, 2010 and January 20, 2011 and did not know why. Defendants' records show the December 14 absence was coded as "excused sick/accident." [280-3] at 110. Robbins was late on January 22 and 27 and did not know why; however, Defendant's records show the absences were coded as "excused sick/accident." [280-3] at 110.

On January 27, Robbins was given a Serious Violation Corrective Action, which stated that Robbins already had 13 points and that because of his attendance violations, he could be separated without prior warning. [292] at 45. Robbins never returned to work after January 27, 2011. Robbins testified that he called his store on February 6, 7 and 8, 2011. Logan testified that when Robbins continued to be a no-call/no show in February 2011, Logan attempted to contact him on multiple occasions, but was unsuccessful. Robbins disputes this. Robbins testified that he was told he was fired before his scheduled shift on February 9, 2011. The termination form shows it was written on February 9, 2011. See [292] at 45.

Peetz would have made the decision to terminate Robbins during both stints of his employment for repeated attendance policy violations and/or job abandonment. Defendants take

the position that Peetz had no knowledge of any alleged migraines or of any request for any accommodation Robbins had made with respect to the attendance or job abandonment policy due to any medical condition; however, EEOC disputes Peetz' lack of knowledge on the basis that Robbins' store manager Logan testified that he brought Peetz a doctor's note excusing Robbins from work. [280-3] at 111; [277-7] at 20.

### b.     Analysis

As with the other claimants, Jackson's failure to accommodate claim must go to a jury. It is disputed whether Robbins is disabled. Robbins testified that he has migraines and told those he worked with that he had migraines. Defendants point to Robbins' medical records, which do not indicate that Robbins suffers from migraines. Since even self-serving testimony can create a material question of fact, this is an issue for a jury to resolve. See *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013); *Marr v. Bank of America, N.A.*, 662 F.3d 963, 968 (7th Cir. 2011) ("'uncorroborated, self-serving testimony, if based on personal knowledge or firsthand experience, may prevent summary judgment against the non-moving party, as such testimony can be evidence of disputed material facts.'" (quoting *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010))).

It is also disputed whether Robbins can perform the essential functions of his job with or without an accommodation. Defendants maintain that Robbins' attendance was so erratic that he cannot perform the essential function of attendance. But he was terminated immediately after reaching 12 points. Viewing the record in the light most favorable to EEOC, during both periods of Robbins' employment with AutoZone, if he had not been assigned points for tardiness or late lunches that were attributable to his migraine headaches, he would not have been terminated. AutoZone's willingness to rehire Robbins and Robbins' alleged discussion with Jackson about his

migraines prior to starting his second period of employment all suggest that even with periodic absences to deal with his migraines, Robbins could still perform the essential functions of his job. Further, for the reasons explained above, the Court cannot say as a matter of law that any employee who goes over the attendance policy's twelve-point limit is unqualified to work at AutoZone.

The record does not contain much discussion of Robbins' ability to maintain consistent attendance going forward. Defendant argues that, to the extent that Robbins sought to come late and/or miss work any time he had a migraine, such an accommodation is not reasonable as a matter of law. EEOC responds that during both periods of Robbins' employment with AutoZone, if he had not been assigned points for tardiness or late lunches that were attributable to his migraine headaches, then he would not have been terminated. Robbins' ability to maintain consistent performance going forward is for the jury to decide; the Court cannot determine this as a matter of law based on the limited discussion provided by the parties.

### 8. Viguera

#### a. Background

Viguera testified that he has experienced a major flare-up of sciatic acute twice in his life – once in 1990, requiring surgery, and then once while working at AutoZone. Viguera testified that when he suffers from a flare-up of sciatic acute, he is in unbearable pain, can't move, and has to lay on the floor while his family brings him food and medicine.

Viguera worked as a Part-Time Driver in the commercial department of an AutoZone store in Brookfield, Illinois, which is part of AutoZone's Chicago Region. Cleveland was the RHRM in this region and had responsibility for the store in which Viguera worked. See [280-3] at 2-3. EEOC disputes that she is the sole decisionmaker with respect to Viguera's failure to accommodate claim. Viguera only worked for AutoZone for five days: July 26, 27, 29, 30 and 31, 2009. Viguera testified that his job involved delivering parts to commercial accounts and admitted that he knew

both that these accounts were customers of AutoZone and that customer service was important. Viguera admitted that he thought his job was an important part of AutoZone's business because it was his duty to make sure that the commercial accounts were happy with the timeliness of the deliveries.

Viguera claims that on the last date that he worked for AutoZone, July 31, 2009, he hurt his back while delivering drums to a customer. Viguera admitted that he did not report this alleged injury to AutoZone that day and never filed a workers' compensation claim against AutoZone. See [280-3] at 73. Viguera testified that the day after the alleged injury, he told a female employee named "Toni" that he was hurt and might need to be out a few days because he thought he had a bulged disc. *Id.* It is unclear from the record who "Toni" is and whether she was a manager. Viguera's usual manager was Muneef Elateek ("Elateek"). Viguera testified that he went back to the store five to seven days after this conversation with "Toni" and told her that he thought he might need to be off another five to six days because he needed to receive physical therapy for a bulged disc. Viguera admitted that he did not return to the store within a week of having this second alleged conversation with "Toni." See [280-3] at 74. However, Viguera testified that he did not think he needed to contact anyone because his manager told him to "take your time." *Id.*

Viguera's medical records indicate that he started physical therapy on August 27, 2009 and completed it on October 29, 2009. Viguera testified that he went to physical therapy approximately three times a week at MacNeal Hospital. Viguera testified that he expected AutoZone to hold his job open indefinitely until he was able to feel better and go back to work. See [265-5] at 24. At his deposition, Viguera initially testified that he returned to AutoZone *after* he finished his physical therapy. See [278-1] at 9. He then modified his answer and testified that he was not sure when he returned to the store to try to work after he hurt his back; it could have been after physical therapy

89

ended or while he was still in physical therapy, and he was sure it was less than twenty days after he hurt his back. See *id.* at 10-11.

Viguera testified that when he came back to the store, he spoke with a male employee, whom Viguera did not know but understood to be a manager. The employee told Viguera that "the computer had removed him from the system" due to his absences. [280-3] at 76. Viguera claims that the employee "told Viguera that he 'kn[e]w his case.'" *Id.* After "being informed that the computer had removed him from the system," Viguera "never contacted his District Manager, Human Resources, or anyone else at AutoZone to try to discuss his termination." *Id.* at 77. Nor did Viguera inquire whether he could reapply to work at AutoZone. *Id.*

According to EEOC, Elateek called Viguera in August 2009 and left messages inquiring where he was, but Viguera never returned the messages or communicated with Elateek. Viguera disputes this and states that he never communicated with Elateek. Around September 9, 2009— which was about five weeks after his injury—Cleveland decided to terminate Viguera for job abandonment. She was unaware of Viguera having any medical condition or requesting any accommodation from the attendance policy. See [280-3] at 77.

### b.     Analysis

Viguera's failure to accommodate claim will need go to a jury, as well. Defendants first move for summary judgment on the basis that EEOC cannot show Viguera was disabled during his employment. They emphasize Viguera's testimony that he did not have a disability but rather hurt his back on the fifth day he worked for AutoZone and received physical therapy. This argument is undeveloped and cannot be resolved on summary judgment. See *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 639 (N.D. Ill. 2020) (denying summary judgment on argument that defendant failed to develop). EEOC makes a reasonable case for treating Viguera

as disabled because he had surgery in 1990 for a herniated disc in his back; he hurt his back approximately five times over the next two decades, causing him to miss work for two to three days at a time; and he has to take care when bending over, extending his arms, or lifting heavy objects to avoid making a "wrong move." Based on this, Viguera might be substantially limited at least in the life activity of working. "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). But rather, the question is whether a plaintiff is limited "as compared to most people in the general population." *Id.*; see also *Bob-Maunuel*, 10 F. Supp. 3d at 880-81. Even "'[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting.'" *Id.* (quoting 29 C.F.R. 1630.2(j)(1)(ix)); see also, e.g., *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (ADA claim involving back injury that prevented "bend[ing], stoop[ing], or kneel[ing]").

The next argument Defendants make in support of summary judgment is that Viguera was not a qualified individual with a disability because he was unable to work at all between July 2009 and at least October 2009, when he completed physical therapy. However, the record on this point is disputed. Resolving disputes and drawing inferences in EEOC's favor, Viguera may have been able to return to work within about 6 to 8 weeks of his injury, but Defendants caused the interactive process to break down, preventing the parties from arriving at this reasonable accommodation.

If Viguera's testimony is believed, he returned to AutoZone within about 20 days of his injury, but the manager on duty informed him that he had been removed from the system for being absent for more than 20 days. While a reasonable factfinder might fault Viguera for not following up by contacting HR or anyone else at AutoZone, it could also place the blame for the breakdown of the interactive process on Defendants, who never requested medical documentation from

Viguera, never (according to him) tried to contact him before deciding on termination, and made no attempt to help him when he returned to AutoZone within about 20 days of injury (according to him) seeking to work. In addition, Viguera's medical records do not indicate one way or the other whether he needed to complete his physical therapy before he could be released to work. Viguera's last physical therapy note on October 1, 2009, indicates he had made good progress in therapy and could self-manage. [292] at 48. Based on this record, a reasonable jury could conclude that if AutoZone had provided Viguera the accommodation of six to eight weeks off so he could attend physical therapy, he could have performed his essential job functions upon return. A jury should be left to determine issues of credibility and whether a leave of this duration is reasonable under the circumstances. See *Haschman*, 151 F.3d at 601 (a reasonable jury could conclude that a two- to four-week leave, which followed plaintiff being on a reduced schedule for four weeks, was a reasonable accommodation for plaintiff's lupus).

Defendants next argue that they are entitled to summary judgment because the EEOC cannot establish that Cleveland, who decided to terminate Viguera, knew that Viguera was disabled. But for the reasons explained above, a reasonable jury could find that Cleveland was not the only relevant decisionmaker and that Defendants were on notice of Viguera's disability and need for an accommodation. According to Viguera, he told Toni that he hurt his back and would be off for a short time, and Toni told him to take his time. AutoZone's attendance records also suggest it was aware of Viguera's disability, as several of the days he was absent, he was excused based on "sickness." In addition, Viguera's store manager Elateek testified that when he came back from his own leave in late August 2009, the District Manager told him that Viguera was in physical therapy due to an injury and to schedule Viguera because he said Viguera had completed his therapy. [278-4] at 28-29. These facts, viewed in the light most favorable to EEOC, present a

92

question of fact to be resolved by the jury on the question of whether the failure of the interactive process can be attributed to AutoZone's inaction rather than a lack of notice on Viguera's part.

## IV.    Conclusion

For these reasons, EEOC's motion for partial summary judgment [297] is denied and Defendants' motion for summary judgment [303] is granted in part and denied in part. Defendant AutoZone, Inc. is entitled to summary judgment on the claims brought against it. Defendants are also entitled to summary judgment on claimant Gomez's (1) retaliation claim and (2) failure to accommodate claim, but only to the extent that it seeks relief from the rotating shift requirement as a reasonable accommodation. Defendant's motion for summary judgment is otherwise denied. This case is set for a telephonic status hearing on October 17, 2022, at 9:45 a.m. Participants should use the Court's toll-free, call-in number 877-336-1829, passcode is 6963747.

Dated: September 30, 2022

Robert M. Dow, Jr.
United States District Judge